**CAPITAL BLUECROSS, Capital Advantage Insurance Company, Petitioners**

v.

**PENNSYLVANIA INSURANCE DEPARTMENT, Respondent.**

**Robert B. Sklaroff, M.D., Petitioner**

v.

**Insurance Department, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 11, 2007.

Decided Nov. 14, 2007.

Reargument Denied in No. 1238 C.D. 2006 on Dec. 28, 2007.

Timothy W. Callahan, II, Philadelphia, for petitioners.

Amy G. Daubert, Harrisburg, for respondent.

Jack M. Stover, Harrisburg, for intervenor, Highmark Inc.

Tyler E. Wren, Philadelphia, for intervenor, Robert B. Sklaroff, MD.

BEFORE: LEADBETTER, President Judge, and McGINLEY, SMITH–RIBNER, PELLEGRINI, FRIEDMAN and SIMPSON, JJ.

## Table of Contents

| | | |
|---|---|---|
| I. | Background | 559 |
| | A. Statutory Background | 559 |
| | B. Proposed Consolidation | 559 |
| | C. 1996 Approval Order | 560 |
| | 1. Extent of Authority: Subsidiaries and Consolidation | 560 |
| | 2. Competition | 560 |
| | 3. Bylaws | 561 |
| | 4. Certificates of Authority | 561 |
| | D. First Appeal: *Kaiser* | 561 |
| II. | Post-Approval Adjudicatory Hearing | 561 |
| | A. Notice | 561 |
| | B. Petitions to Intervene | 562 |
| | C. Parties | 562 |
| | D. Hearing | 562 |
| | E. 2006 Koken Order | 563 |
| | 1. Subsidiaries/Competition | 563 |
| | 2. Bylaws | 563 |
| | 3. Certificates of Authority | 563 |
| III. | Collateral Action | 563 |
| IV. | Dr. Sklaroff's Appeal | 564 |
| | A. Application to Quash | 566 |
| | 1. Standing Requirements | 566 |
| | 2. Zone of Interests Analysis Inapplicable | 567 |
| | 3. Substantial, Direct and Immediate Interest | 567 |
| | B. Jurisdiction over Highmark Consolidation | 568 |
| | 1. Contentions | 568 |

2. Nonprofit Law ........................................................................... 569
3. Blue Plans Excluded From Department's Review of Corporate Transactions
 of Licensed Insurers ............................................................... 569
4. GAA Amendments .................................................................... 570
5. Insurance Holding Companies Act ........................................... 570
6. Other Arguments ..................................................................... 571
C. Dual Certification ........................................................................ 572
1. Contentions .............................................................................. 572
2. Nonprofit Law .......................................................................... 572
3. Blue Plans Act .......................................................................... 573
 a. Consolidation .................................................................... 573
 b. Certificates of Authority .................................................... 573
D. Highmark's Operation under Certificates Issued to Others ............ 574
1. Contentions .............................................................................. 574
2. Property Rights ........................................................................ 575
3. Passing of Property Rights to Highmark ................................... 575
4. Operation under Existing Certificates ...................................... 575
E. Highmark Bylaws ........................................................................ 576
1. Contentions .............................................................................. 576
2. Blue Plans Act .......................................................................... 576
3. Discussion ................................................................................ 577
F. Competitive Analysis for Subsidiaries ......................................... 578
1. Contentions .............................................................................. 578
2. Insurance Holding Companies Act ........................................... 579
3. Discussion ................................................................................ 579
G. Other Challenges to 2006 Koken Order ........................................ 580
H. Errors by Hearing Officer ............................................................ 580
1. July 5, 2000 Order: Anti-Competitive Effect ........................... 581
2. July 5, 2000 Order: Burden of Proof ........................................ 581
3. November 2, 2001 and March 25, 2002 Discovery Orders ........ 582
4. November 27, 2002 Order: Social Mission ................................ 582
5. November 27, 2002 Order: "Already Affiliated Person" ............ 583
 a. Background ....................................................................... 583
 b. Definitions ........................................................................ 583
 c. Contentions ....................................................................... 584
 d. Discussion ......................................................................... 584
6. Hearing: Refusal of Continuance ............................................. 584
7. Hearing: Preclusion of Testimony by Dr. Sklaroff ................... 585
 a. Contentions ....................................................................... 585
 b. Discussion ......................................................................... 586
8. Hearing: Limits on Use of Notes, Optimization of Testimony ... 586
9. Hearing: Hearing Officer Bias .................................................. 587
I. Other Issues ................................................................................. 587
V. Capital's Appeal .............................................................................. 587
A. Pre-Argument Order .................................................................... 588
B. 2 Pa.C.S. § 702 ............................................................................ 588
C. Case Law: Non-Participation at Agency Level ............................. 588
D. Case Law: Competitor Standing ................................................... 589
E. Discussion ................................................................................... 591
1. Petitions to Intervene .............................................................. 591
2. Contentions .............................................................................. 592
3. Analysis: Proof of Harm ........................................................... 593
4. Analysis: Statutory Basis for Standing .................................... 593
 a. Blue Plans Act ................................................................... 593
 b. Insurance Holding Companies Act ..................................... 593
F. Conclusion ................................................................................... 594

OPINION BY Judge SIMPSON.

These most recent administrative agency appeals involving the consolidation of two "blue plans" are the culmination of 12 years of litigation. Most at issue are orders issued by two Insurance Commissioners essentially permitting the 1996 consolidation to the extent reviewable under the Insurance Department's jurisdiction. Nu-

merous evidentiary and procedural rulings by a hearing examiner are also contested.

In his appeal, Robert B. Sklaroff, M.D. (Dr. Sklaroff), who ostensibly represents himself in written argument but who was represented by counsel at oral argument, petitions for review of a 2006 final order of former Insurance Commissioner M. Diane Koken (2006 Koken Order) that dismissed his challenge to former Commissioner Linda S. Kaiser's November 1996 decision and order (1996 Approval Order) approving Highmark Inc.'s (Highmark) proposed bylaws and authorizing the change of control of six domestic insurance company subsidiaries (Subsidiaries).

In their appeal, Capital BlueCross and Capital Advantage Insurance Company (collectively, Capital), which did not participate in the administrative proceedings, petition for review of the 2006 Koken Order.

Highmark is the consolidated corporate successor of the former Blue Cross of Western Pennsylvania (Western Blue Cross) and former Pennsylvania Blue Shield (Blue Shield). Highmark intervened in the appeals, and it seeks to quash both appeals.

For the reasons that follow, we deny Highmark's application to quash Dr. Sklaroff's appeal, but we affirm the 2006 Koken Order on its merits. Because Capital did not seek to participate in the adjudicatory hearing before Commissioner Koken, it waived its opportunity to establish the requisite standing. Therefore, we quash Capital's appeal.

## I. Background

### A. Statutory Background

Several statutes are relevant to these appeals. First is the Nonprofit Corporation Law of 1988, 15 Pa.C.S. §§ 5101–5997 (Nonprofit Law), which governs domestic not-for-profit corporations, and assigns administration to the Department of State.

Next is the Health Plan Corporations Act (Blue Plans Act), 40 Pa.C.S. §§ 6101–27, 6301–35, which authorizes the certification and operation of both nonprofit hospital plans (Blue Cross plans) and nonprofit professional health services plans (Blue Shield plans). Among other things, the Blue Plans Act addresses bylaws and the structure of boards of directors of professional health service corporations and general medical service corporations operating Blue Shield plans. Some administration is assigned to the Department of Insurance, and some regulation is assigned to the Department of Health.

Also relevant is the Insurance Holding Companies Act [1], which generally addresses change of ownership interests of domestic insurers. Significantly, the definition of "Insurer" in Section 1401 of the Insurance Holding Companies Act, 40 P.S. § 991.1401, excludes nonprofit medical and hospital service organizations. Administration resides with the Department of Insurance (Department).

### B. Proposed Consolidation

Prior to their consolidation, Western Blue Cross and Blue Shield, organized under the Nonprofit Law, operated as separate nonprofit health plan corporations or "blue plans" as authorized by the Blue Plans Act. Western Blue Cross operated a nonprofit hospital plan. Its plan provided hospitalization coverage in 29 western Pennsylvania counties. Blue Shield operated a nonprofit professional health services plan. Blue Shield's health services

---

1. Article XIV of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended, added by* the Act of December 18, 1992, 40 P.S. §§ 991.1401–991.1413.

plan provided general medical, dental and optometric coverage statewide.

In 1995, Western Blue Cross and Blue Shield decided to consolidate into a single new corporate entity, "New Blue Cross/ Blue Shield," later renamed Highmark. To that end, they submitted a proposed consolidation plan to the Department for approval. The consolidation plan included Highmark's proposed bylaws. A question arose as to which statutes governed different aspects of the consolidation.

The proposed consolidation also resulted in Highmark's acquisition of control of all or part of Subsidiaries. Pursuant to the Insurance Holding Companies Act, the Department must approve a proposed change in control of domestic insurers.[2]

In March 1996, Western Blue Cross and Blue Shield submitted two Form A filings [3] seeking approval for a change in control of Subsidiaries. Thereafter, Commissioner Kaiser held a *pre-approval* "public informational hearing" on the proposed consolidation.[4] In addition, the Commissioner received written comments from individuals and organizations supporting and opposing the consolidation. At the pre-approval hearing, representatives from Western Blue Cross and Blue Shield spoke regarding the consolidation and change in control of Subsidiaries. The Commissioner then held the record open for additional written comments.

### C. 1996 Approval Order

### 1. Extent of Authority: Subsidiaries and Consolidation

Ultimately, Commissioner Kaiser approved the Form A filings, thereby approving the change in control of Subsidiaries. However, because the Insurance Holding Companies Act excludes "blue plans" from the definition of insurers regulated by that Act, Commissioner Kaiser determined she lacked subject matter jurisdiction under that Act over the consolidation of Western Blue Cross and Blue Shield. She determined the consolidation was instead controlled by the Nonprofit Law, administered by the Department of State.

This was a central decision which was confirmed multiple times throughout these proceedings. Several issues in the current appeal are based on this decision.

### 2. Competition

Consistent with her decision regarding lack of authority over the consolidation, Commissioner Kaiser determined the competitive standards in Section 1403(d) of the Insurance Holding Companies Act do not apply to the Highmark consolidation.

---

**2.** Pursuant to Section 1402(f)(1) of the Insurance Holding Companies Act, 40 P.S. § 991.1402(f)(1), the Commissioner must approve a proposed change in control of a domestic insurer absent a finding

....

(ii) *The effect of the merger or other acquisition of control would be to substantially lessen competition in health care insurance in the Commonwealth or create a monopoly therein;*

**3.** *See* 31 Pa.Code §§ 25.1–25.23, Appendix A, Form A (Statement Regarding the Acquisition of Control of or Merger with Domestic Insur-

er). The first Form A related to four eastern and central Pennsylvania insurers in which Blue Shield had an interest. The second Form A related to two western Pennsylvania insurers in which Western Blue Cross had an interest.

**4.** None of the parties to the acquisition requested a hearing. However, Section 1402(f)(2) of the Insurance Holding Companies Act authorizes the Department to hold a discretionary hearing on a proposed acquisition absent a request by the parties to the acquisition. 40 P.S. § 991.1402(f)(2).

Even assuming they did, the consolidation met those standards.

Also, she determined the Highmark consolidation fulfills the charitable and benevolent purposes of Western Blue Cross and Blue Shield. Highmark, successor to those companies, remains bound by the same Blue Plans Act requirements.

### 3. Bylaws

Commissioner Kaiser approved Highmark's bylaws. The Commissioner determined the proposed bylaws complied with the Blue Plans Act provisions regulating a general medical service corporation's board of directors. *See* 40 Pa.C.S. § 6328(b).

### 4. Certificates of Authority

Additionally, Commissioner Kaiser made the following determinations. First, Highmark, operating as both a hospital plan and health services plan, is subject to the requirements of the Blue Plans Act's hospital plan and health services plan provisions. Second, under Section 5929(b) of the Nonprofit Law, 15 Pa.C.S. § 5929(b), the certificates of authority of Western Blue Cross and Blue Shield passed as property rights to Highmark by operation of law. Thus, no new certificate of authority was required.

This was also a decision confirmed repeatedly in the ensuing proceedings. It forms the basis of an important issue before the Court in the current appeal.

As a result of the 1996 Approval Order, Highmark came into existence and began operations as proposed. A later, collateral challenge to the operations in the nature of a request for stay pending final adjudica-

tion was filed in 2002 and is described below.

### D. First Appeal: *Kaiser*

Thereafter, Dr. Sklaroff and several other opponents (Opponents) petitioned this Court for review of the 1996 Approval Order. Capital, however, did not join them.

In *Philadelphia County Medical Society v. Kaiser*, 699 A.2d 800 (Pa.Cmwlth.1997), we determined the 1996 Approval Order did not constitute a final appealable order under 2 Pa.C.S. § 504 [5] because Opponents were not provided an adjudicative hearing and no evidentiary record was made. Consequently, we transferred Opponents' appeal to the Department for a *post-approval* adjudicatory proceeding "to consider whether Opponents' interests are sufficiently direct so as to be a 'party' and, if so, [to] conduct sufficient hearings to resolve any factual disputes." *Id.* at 807.

The *Kaiser* decision did not invalidate the 1996 Approval Order; rather, it transferred Opponents' appeal to Commissioner Koken for a post-approval proceeding that provided Opponents an opportunity to be heard and to create a record upon which judicial review would be possible. *Id.* at 806–07.

### II. Post–Approval Adjudicatory Hearing

### A. Notice

On September 12, 1997, Commissioner Koken issued an order inviting Opponents Pennsylvania Society of Internal Medicine (PSIM) and Dr. Sklaroff to file a petition to intervene under the General Rules of Administrative Practice and Procedure, 1

---

**5.** 2 Pa.C.S. § 504 provides (emphasis added):
No adjudication of a Commonwealth agency shall be valid as to any party *unless he shall have been afforded reasonable notice* *of a hearing and an opportunity to be heard.* All testimony shall be stenographically recorded and a full and complete record shall be kept of the proceedings.

Pa.Code §§ 35.27–35.32, if they wished to challenge the 1996 Approval Order. *See* Certified Record (C.R.) Ex. 6 (September 1997 Koken Order) at 1–3; Capital Reproduced Record (Cap. R.) at 31–33. the Commissioner directed, petitions to intervene should state the grounds for intervention, and the "facts relied upon by the petitioner from which the nature of the alleged right or interest of the petitioner can be determined . . . ." *Id.* at 2; Cap. R. at 32. Further, the petitions to intervene should "fully and completely advise parties and the agency as to specific issues of fact or law contained in the [1996 Approval Order] to be raised or controverted . . . ." *Id.* In addition, Commissioner Koken's order provided:

> Any interested persons shall file protests, petitions to intervene, or notices of intervention, in writing with [Acting Docket Clerk], Administrative Hearings Office . . . on or before October 27, 1997. (*Id.* at 3; Cap. R. at 33.)

On September 27, 1997, Commissioner Koken published this order as a public notice in the *Pennsylvania Bulletin. See* 27 Pa. B. 4981 (1997).

### B. Petitions to Intervene

Thereafter, petitions to intervene were filed by PSIM/Dr. Sklaroff, the Insurance Federation of Pennsylvania, Inc. (Federation), the Pennsylvania Medical Society, and the Mon Valley Unemployed Committee. The Department filed a notice of intervention. Capital, however, did not file a protest or petition to intervene.

### C. Parties

In January 1999, Commissioner Koken issued an interim opinion and order (1999 Koken Order) discussing her jurisdiction under the statutes involved. *See* C.R. Ex. 73; Cap. R. at 275–316. In Paragraph 2 of the 1999 Koken Order, Commissioner Koken limited the scope of the proceedings

"to consideration of the change in control of Subsidiaries, Highmark's certificate of authority and Highmark's bylaws and governance." *Id.* (Order at ¶ 2); Cap. R. at 315.

Additionally, Commissioner Koken reviewed each of the objectors' interests and determined whether they had standing to intervene. The 1999 Koken Order provides in relevant part:

> 4. The petitions to intervene filed by the Pennsylvania Society of Internal Medicine and Robert B. Sklaroff, M.D. . . .; by the Insurance Federation of Pennsylvania to file an amicus brief . . .; by the Mon Valley Unemployed Committee on behalf of itself and its members . . .; and by the Pennsylvania Medical Society, James R. Regan, M.D. and Lee H. McCormick, M.D. . . . are GRANTED, except that participation by Mon Valley shall be limited to participation as amicus.

*Id.* (Order at ¶ 4); Cap. R. at 316.

Thereafter, the proceeding moved slowly. James A. Johnson, Commissioner Koken's Presiding Officer (Hearing Officer) issued numerous orders addressing various procedural matters, including discovery requests and other evidentiary issues. Eventually, Dr. Sklaroff became the sole challenger to the 1996 Approval Order.

### D. Hearing

Ultimately, Hearing Officer held a two-day *de novo* hearing on Dr. Sklaroff's challenges. Notably, Dr. Sklaroff only presented his own testimony. He also offered reports prepared by two expert witnesses who did not appear to testify. As a result, Hearing Officer sustained objections to the two reports on authentication and hearsay grounds. However, six exhibits were ad-

mitted by stipulation of the parties.[6] Additionally, Highmark presented the testimony of one witness, Colleen Gallagher, Blue Shield's Director of Regulatory Affairs in 1995–96. Thereafter, the evidentiary record closed.

### E. 2006 Koken Order

#### 1. Subsidiaries/Competition

In November 2006, Commissioner Koken issued her post-approval adjudication and order dismissing Dr. Sklaroff's challenges to the 1996 Approval Order. Commissioner Koken confirmed Commissioner Kaiser's analysis of the issues relating to her approval of the change in control of Subsidiaries. Particularly, Commissioner Koken noted Dr. Sklaroff presented no competent evidence showing Commissioner Kaiser improperly analyzed the effect of the control change or that the control change would either substantially lessen insurance competition in the Commonwealth or tend to create a monopoly.

#### 2. Bylaws

Commissioner Koken also determined Highmark's bylaws met the Blue Plans Act's requirements for a board of directors for both professional health service plans and general medical service plans. *See* 40 Pa.C.S. §§ 6328(a),(b). Commissioner Koken observed that the legislature, through 40 Pa.C.S. § 6328(b), made it clear that subscribers, not physicians, are to have the dominant voice on the board of directors of a general medical services corporation.

#### 3. Certificates of Authority

Additionally, Commissioner Koken confirmed her interim ruling that Highmark

possessed valid certificates of authority under the Blue Plans Act to operate as a hospital plan under 40 Pa.C.S. § 6102 and a professional health service plan under 40 Pa.C.S. § 6304. This was consistent with a prior ruling[7] in which the Commissioner noted Highmark exists under the Nonprofit Law and operates under the Blue Plans Act. No provision in either statute prevents dual certification.

### III. Collateral Action

In January 2002, months before the hearing of December, 2002, Capital filed a collateral action before Commissioner Koken seeking declaratory and injunctive relief. Capital's petition requested a declaration that Highmark lacked legal authority to operate both "blue plans" until Commissioner Koken issued a final order in the post-approval proceeding. Capital also sought a stay prohibiting Highmark from offering competing insurance products in Capital's service area until a final order was issued in the post-approval hearing. Commissioner Koken denied Capital's petition for injunctive and declaratory relief and dismissed Capital's request for stay as moot. Capital appealed, and this Court affirmed. *See Capital Blue Cross v. Pa. Ins. Dep't,* (Pa.Cmwlth. No. 653 C.D. 2002, filed August 12, 2003).

In *Capital Blue Cross,* we noted the 1996 Approval Order explicitly authorized Highmark to operate as both a hospital plan and professional health service plan. *Id.,* slip op. at 4. We also rejected Capital's argument that our decision in the first appeal, *Kaiser,* invalidated the 1996 Approval Order:

---

**6.** This evidence included both Form A Statements Regarding Highmark's Acquisition of Control of Domestic Insurer; Commissioner Kaiser's 1996 Approval Order; Highmark's proposed bylaws; Blue Shield's bylaws; and

Blue Cross' bylaws. See C.R. Exs. Supp. H1–H6; Cap. R. at 1301–1824.

**7.** *See* Commissioner Koken's December 2002 order, C.R. Ex. 406; Cap. R. at 1058–70.

Contrary to Capital's position, our decision in *Kaiser* did not vacate the [1996 Approval Order]. It merely transferred the case for an administrative hearing under [2 Pa.C.S. § 504]. Moreover, subsequent orders reaffirmed the continued viability of the [1996 Approval Order].

*Capital Blue Cross,* slip. op. at 8, n. 4. We also recognized that Commissioner Koken's December 2002 order Commissioner Koken rejected similar challenges by Dr. Sklaroff to the legality of Highmark's dual certification. *See* C.R. Ex. 406; Cap. R. at 1058–70.

Consequently, we concluded in *Capital Blue Cross* that Commissioner Koken did not err or abuse her discretion by denying Capital's request for declaratory relief. Further, noting some uncertainty would remain until the final order in the post-approval adjudicatory hearing as to whether Highmark can permanently operate under its dual certificates, we affirmed Commissioner Koken's denial of declaratory relief.

Thereafter, Dr. Sklaroff, representing himself, appealed the 2006 Koken Order to this Court. Capital also appealed the 2006 Koken Order.[8] Highmark intervened in both appeals, which were consolidated.

## IV. Dr. Sklaroff's Appeal

In his appeal, Dr. Sklaroff essentially raises seven broad assignments of error. He asserts the Commissioners erred in determining they lacked subject matter jurisdiction over the Highmark consolidation; Highmark illegally holds dual-certification; Highmark illegally "inherited" its certificates of authority; Hearing Officer erred by failing to address Dr. Sklaroff's antitrust concerns and erred by limiting Dr. Sklaroff's testimony about his concerns regarding Highmark's social mission; Highmark's bylaws compromise its capacity to achieve the traditional Blue Shield social mission; the Commissioners erred by disregarding the testimony of a Highmark witness · identifying the relevant product service area (health insurance) and the relevant geographic area (Western Blue Cross's 29–county service area); and the 2006 Koken Order is defective because it ignores the bias of Hearing Officer, its factual analysis is flawed and incomplete, and it ignores Dr. Sklaroff's post-hearing and reply briefs.[9]

**8.** We will not reverse or modify an agency adjudication unless it violates constitutional rights, is not in accord with agency procedure or with applicable law, or unless any finding necessary to support the adjudication is not based upon substantial evidence. 2 Pa.C.S. § 704. *Indep. Blue Cross v. Pa. Ins. Dept.,* 802 A.2d 715 (Pa.Cmwlth.2002).

**9.** Because Dr. Sklaroff's Petition for Review and various briefs do not consistently state or organize the many issues and sub-issues, we reference the statement of issues in his Preliminary Brief in Support of Petition for Review, which was filed at the same time as his Petition for Review. That document identifies the issues as follows (with emphasis in original):

a. The Commissioner had jurisdiction over the consolidation and, thus, inappropriately disregarded the lack of validity of the [Blue Shield] Corporate Membership's consolidation-approval vote. ........................ 3

1. The Commissioner **had** jurisdiction over the consolidation, because the Pennsylvania Insurance Holding Companies Act requires that the Insurance Commissioner approve all changes in control of domestic insurers or HMOs .................................. 3

2. The Commonwealth Court **mandated** that adjudicatory Hearings be held ............... 5

3. The *LaFarge* Opinion **reinforces** the need for an adjudicatory hearings process in the instant case ............................... 6

4. [Blue Shield] did **not** provide the Corporate Members necessary legal data about [Western Blue Cross] prior to the vote to approve the consolidation, thereby denying them the opportunity to weigh its impact on both fiscal and ethical planes ....................... 11

5. [Blue Shield] (in-writing and orally, through its corporate officers and executives) provided the Corporate Members **material** misrepresentations and omissions prior to the vote to approve the consolidation, thereby denying them the opportunity to weigh its impact on both fiscal and ethical planes .............. 17

6. The Consolidation was **not** approved by the [Blue Shield] Corporate Members ........... 18

7. In her 12/2/2002 Order, the Commissioner provided **tangential** argument supporting the necessity for the Commissioner to have oversighted the consolidation ................... 19

b. "Highmark" illegally holds dual-certification, lacking any authority to operate as a single entity under the Certificates of Authority of both a hospital plan and professional health service plan .............................. 20

1. Pennsylvania law does **not** allow a single entity to operate under the Certificates of Authority for both a Hospital Plan and Professional Health Service Plan .............. 20

2. Enabling statutes insulate these entities from each other, necessitating that both exist **independently** ........................... 26

3. Adopting a chapter heading to define "Highmark" as a "health plan corporation" **violates** the fundamental rules of construction, documenting the fact that "Highmark" and the Department have exceeded statutory authority ................................ 28

4. In other states, specific legislative authority was conferred **prior** to consolidation of comparable entities ........................... 31

5. In her 12/2/2002 Order, the Commissioner provided argument supporting dual-certification that **ignored** law and logic, instead self-satirizing her oversight performance ........ 32

6. *Resolution of this issue is now (and long has been)* **"ripe."** ............................. 34

c. "Highmark" illegally "inherited" Certificates of Authority held by [Blue Shield] and [Western Blue Cross] having passed "by operation of law." ................................. 38

1. A Certificate of Authority is **not** a franchise, but a license to do business, personal to the holder and not transferable ................ 38

2. "Highmark" has functioned **illegally** because it never applied for (and, thus, was never granted) a new Certificate of Authority ...... 42

3. In her 12/2/2002 Order, the Commissioner provided argument supporting licensure-inheritance that **ignored** law and logic, while corrupting Sklaroff's argument ............. 44

d. [Hearing Officer] excluded vital anti-trust concerns from being addressed during the hearing, thereby gutting this effort .......... 44

1. In his 7/5/2000 Order, [Hearing Officer] inappropriately and inexplicably excluded considering at the Hearing basic **anti-trust** concerns that were to be raised ..................... 45

2. In his 11/2/2001 Order, [Hearing Officer] inappropriately and inexplicably excluded from consideration at the Hearing **basic** anti-trust concerns that were to be raised, and "Highmark" did not subsequently produce many approved documents ....................... 48

3. In his 3/25/2002 Order, [Hearing Officer] inappropriately and inexplicably rejected subsequent efforts to acquire documents in **follow-up** ................................ 48

4. In his 11/27/2002 Order, [Hearing Officer] inappropriately and inexplicably **precluded** presentation of evidence on (1)—whether "Highmark" had fulfilled its social mission, and (2)—whether KHPW affected competition, wrongly considering it an "already affiliated person" ............................. 48

5. During the Hearing, [Hearing Officer] **precluded** Sklaroff from acquiring a replacement for his suddenly-absent economic expert, contradicting the flexibility manifest in his 11/27/2002 order permitting the Department to delay testimony until its witness could become available ........................... 56

6. During the Hearing, [Hearing Officer] **precluded** Sklaroff from testifying regarding his appreciation of the anti-trust issues, despite the fact that *inter alia* he had served as regional coordinator of a union (The Federation of Physicians and Dentists) who had served (successfully) as a representative of a physician-member who had been wrongfully terminated due to his involvement therein.................................... 58

7. During the Hearing, [Hearing Officer] **precluded** Sklaroff from testifying regarding any negative experience as a [Blue Shield] subscriber; furthermore, Sklaroff was not even permitted to answer a generic question regarding how the [Blue Shield] and Blue Cross plans had been established in Pennsylvania ............................. 59

e. **[Hearing Officer] precluded Sklaroff from optimizing his testimony regarding his concerns regarding the Social Mission** .......... 60

## A. Application to Quash

Highmark filed an application to quash for lack of standing. Although Dr. Sklaroff was granted intervenor status at the administrative level based on his interests as a Blue Shield subscriber, a Blue Shield physician provider and a former Blue Shield corporate member, Highmark alleges Dr. Sklaroff lacks standing to appeal to this Court and challenge Commissioners Koken's interpretation and implementation of either the Blue Plans Act or the Insurance Holding Companies Act.

### 1. Standing Requirements

To have standing to challenge an official order or action of a Commonwealth agency, a party must be aggrieved by it. Pa. R.A.P. 501;[10] 2 Pa.C.S. § 702;[11] *Beers*

1. During the Hearing, [Hearing Officer] precluded Sklaroff from being able to refer to prepared notes, even when he offered opposing counsel a chance to read them .......... 60

2. During the Hearing, [Hearing Officer] precluded Sklaroff from being able to correlate the contents of his orientation (as a [Blue Shield] Corporate Member) to stipulated facts related to the provision of Medicare and Medicaid "managed care" services .............. 60

f. The "Highmark" bylaws compromised the capacity to optimize achievement of the traditional [Blue Shield] Social Mission ....... 61

1. The "Highmark" bylaws precluded presenting Special Resolutions by physicians such as himself, thereby compromising the capacity to optimize achievement of the traditional [Blue Shield] Social Mission ............... 61

2. The "Highmark" bylaws eliminated any "grass-roots" involvement of physicians, disenfranchising such physicians as Dr. Sklaroff, who had been elected by his peers to serve as a [Blue Shield]Corporate Member ................................ 62

g. The "Highmark" witness testified that, when she worked for [Blue Shield] she dealt with a relevant product service area as being "health insurance" and a relevant geographic area as being definable as that of the [Western Blue Cross] (i.e., the western 24 counties).................................. 63

1. The "Highmark" witness testified that, when she worked for [Blue Shield], she dealt with a relevant product service area as being "health insurance" ........................ 63

2. The "Highmark" witness testified that, when she worked for [Blue Shield], she dealt with a relevant geographic area as being definable as that of [Western Blue Cross] (i.e., the western 24 counties) ........................ 64

h. The Commissioner's 5/26/2006 Order was defective, both with regard to its having ignored the bias of [Hearing Officer] and with regard to her incomplete and flawed factual analysis ................................... 65

1. [Hearing Officer] admitted bias, and consistently exhibited same when crucial matters were adjudicated ......................... 65

2. The Department did not perform its initial adjudication with due diligence ............. 66

3. In his 7/5/2000 Order, [Hearing Officer] mistakenly forced Sklaroff (instead of the Department) to accept the Burden of Proof ........ 66

4. The Commissioner's 5/26/2006 Order dismissed without discussion the salient facts established at the Hearing regarding the Social Mission concern, as it affected the "Highmark" bylaws ............................ 68

5. The Commissioner's 5/26/2006 Order dismissed without discussion the salient facts established at the Hearing regarding the Monopoly concern ........................... 70

i. The Commissioner's 5/26/2006 Order was defective, both with regard to its having ignored Sklaroff's Post–Hearing Brief and with regard to her having ignored Sklaroff's Reply to the Briefs of Respondents "Highmark" and the Department ................ 72

1. The Commissioner's 5/26/2006 Order was defective with regard to its having ignored the Conclusions of Law in Sklaroff's Post–Hearing Brief ................................. 72

2. The Commissioner's 5/26/2006 Order was defective with regard to its having ignored Sklaroff's Reply to the Briefs of Respondents "Highmark" and the Department ........... 78

10. Pa. R.A.P. 501 provides, "Except where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order ... may appeal therefrom."

11. 2 Pa.C.S. § 702 provides, "Any person aggrieved by an adjudication of a Common-

*v. Unemployment Comp. Bd. of Review,* 534 Pa. 605, 633 A.2d 1158 (1993). "In order to be 'aggrieved' a party must (a) have a substantial interest in the subject-matter of the litigation; (b) the interest must be direct; and (c) the interest must be immediate and not a remote consequence." *Bankers Life & Casualty Company v. Unemployment Comp. Bd. of Review,* 750 A.2d 915, 917 (Pa.Cmwlth.2000), *citing Beers; Wm. Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975).

 "A 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law." *S. Whitehall Twp. Police Serv. v. S. Whitehall Twp.,* 521 Pa. 82, 86, 555 A.2d 793, 795 (1989). "A 'direct' interest requires a showing that the matter complained of caused harm to the party's interest." *Id.* at 86–87, 555 A.2d at 795. "An 'immediate interest' involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question." *Id.* at 87, 555 A.2d at 795 (citations omitted).

Here, Highmark asserts Dr. Sklaroff lacks standing to appeal the 2006 Koken Order predicated on standing under either the Blue Plans Act or the Insurance Holding Companies Act because his interests do not fall within the zone of interests protected by either statute. Further, Highmark contends Dr. Sklaroff did not establish he was aggrieved by the 2006 Koken Order.

wealth agency who has a direct interest in such adjudication shall have the right to ap-

### 2. Zone of Interests Analysis Inapplicable

Highmark first asserts Dr. Sklaroff lacks standing to appeal the 2006 Koken Order because his interests do not fall within the zone of interests protected by the Acts. Although a zone of interests analysis may be applicable in determining eligibility to intervene at the administrative level under 1 Pa.Code 35.28(1) (interest conferred by state or federal statute), standing to appeal under 2 Pa.C.S. § 702 is governed by the substantial, direct and immediate interest test. *See Pa. Bankers Ass'n v. Pa. Dep't of Banking & TruMark Fin. Credit Union,* 893 A.2d 864 (Pa. Cmwlth.2006), *appeal granted,* 591 Pa. 729, 920 A.2d 835 (2007).

### 3. Substantial, Direct and Immediate Interest

 Based on the averments in Dr. Sklaroff's petition to intervene, Commissioner Koken determined Dr. Sklaroff purchases Blue Shield coverage for himself, his family and his employees. Commissioner Koken noted the allegation that the Highmark approval would allow Highmark "to dictate prices, hurt competition, decrease quality of care, terminate physician contracts, dictate unfavorable contract terms, lessen physician governance and destroy the social mission of [Blue Shield]." C.R. Ex. 73 (January 1999 Koken Decision) at 31; Cap. R. at 305.

Commissioner Koken also noted Dr. Sklaroff was an elected corporate member of Blue Shield. Dr. Sklaroff alleged the Highmark consolidation would divest him of his elected position and deprive him and other physician members of their ability to participate in Blue Shield/Highmark governance. *Id.* Commissioner Koken further observed Dr. Sklaroff, a Blue Shield pro-

peal therefrom to the court vested with jurisdiction of such appeals...."

vider, also asserts he participated in Blue Shield's social mission to provide medical care to low income persons at affordable rates. He also had a provider contract with one of the subsidiaries. *Id.*

Highmark does not contest Dr. Sklaroff's status as a Blue Shield subscriber/consumer, provider and former corporate member. Dr. Sklaroff alleges a number of harms to his interests resulting from the Highmark formation. In view of Dr. Sklaroff's status, we conclude Dr. Sklaroff established a substantial, direct and immediate interest in the 2006 Koken Order. *S. Whitehall Twp. Police Serv.; Wm. Penn Parking Garage, Inc.* As a result, Dr. Sklaroff adequately established he was aggrieved by the 2006 Koken Order and thus has standing under 2 Pa. C.S. § 702 to appeal that decision to this Court. *Id.*

Accordingly, Highmark's application to quash is denied.

### B. Jurisdiction over Highmark Consolidation

#### 1. Contentions

Dr. Sklaroff asserts the Commissioners erred by failing to exercise jurisdiction over the consolidation of Western Blue Cross and Blue Shield. He contends that had the Commissioners exercised the required oversight they would have rejected the proposed consolidation because the votes of the Blue Shield membership were insufficient to approve a change of bylaws and because material information was concealed before the Blue Shield vote.

More specifically, Dr. Sklaroff argues the Commissioners had jurisdiction over the consolidation because the Insurance Holding Companies Act requires the Commissioners to approve all changes in control of domestic insurers. He concedes that under the Insurance Holding Companies Act nonprofit medical and hospital service corporations are specifically excluded from Section 1401's definition of "insurer." 40 P.S. § 991.1401. However, Dr. Sklaroff asserts, such entities are not excluded from Act's definitions of "person" (*id.*) and "domestic insurer." (40 P.S. § 991.1402(a)(2)). Consequently, Dr. Sklaroff argues "blue plans" as "persons," are within the purview of the statute if they acquire control of a "domestic insurer," even if the domestic insurer being acquired is another "blue plan" corporation.[12] At times, Dr. Sklaroff also contends that this Court in *Kaiser*, anticipated adjudicatory review of the consolidation, and that Commissioner Koken, in her December 2, 2002 order, expressed her desire to have jurisdiction over the consolidation.

Both Highmark and the Department counter the Commissioner lacks subject matter jurisdiction under the Insurance Holding Companies Act over the consolidation of Blue Shield and Western Blue Cross, two nonprofit corporations certificated under the Blue Plans Act.

Highmark argues: the Nonprofit Law, which is administered by the Department of State and not the Department of Insurance, authorizes the consolidation; the

---

**12.** Additionally, Dr. Sklaroff alleges Blue Shield committed various irregularities related to the consolidated approval vote. Dr. Sklaroff also asserts the Blue Shield corporate membership did not approve the consolidation because the vote fell short of the 75% needed to amend Blue Shield's bylaws. The certified record, however, contains no information regarding the Blue Shield corporate membership consolidation approval vote. Thus, these issues cannot be considered because they rely on information outside the certified record. *Pellizzeri v. Bureau of Prof'l and Occupational Affairs*, 856 A.2d 297 (Pa. Cmwlth.2004) (appellate court will not consider arguments based on facts outside the certified record).

General Assembly expressly excludes the consolidation of "blue plans" from laws that empower the Department to review fundamental corporate transactions of licensed insurers; the Commonwealth Court did not hold in the first appeal, *Kaiser*, that the Department has jurisdiction over the consolidation; and, whether oversight of consolidation of "blue plans" is desirable is a question for the General Assembly.

The Department argues that the Insurance Holding Companies Act clearly and expressly excludes "blue plans" from Section 1401's definition of "insurer." Because of the exclusion, the Department had no authority to consider the market shares of Western Blue Cross and Blue Shield in deciding whether the change of control of their Subsidiaries violated the competitive standard of that Act. Further, the plain language of the Blue Plans Act excludes "blue plans" from the competitive standard analysis under Section 1403 of the Insurance Holding Companies Act, 40 P.S. § 991.1403.

### 2. Nonprofit Law

■ The Blue Plans Act requires both types of "blue plans," hospital plans and health service plans, to be operated by domestic nonprofit corporations. *See* 40 Pa.C.S. §§ 6101, 6102(a), 6302, 6304(a). The Blue Plans Act is silent on the issue of consolidations of nonprofit corporations operating the two types of "blue plans." Consequently, the provisions of the Nonprofit Law addressing consolidations are applicable.

Section 5921(a) of the Nonprofit Law, 15 Pa.C.S. § 5921, authorizes consolidations of nonprofit corporations. 15 Pa.C.S. § 5921(a) provides:

(a) **Domestic surviving or new corporation.**—Any two or more domestic nonprofit corporations, or any two or more foreign corporations not-for-profit, or any one or more domestic nonprofit corporations, and any one or more foreign corporations not-for-profit, may, in the manner provided in this subchapter, be merged into one of such domestic nonprofit corporations, hereinafter designated as the surviving corporation, or consolidated into a new corporation to be formed under this article, if such foreign corporations not-for-profit are authorized by the law or laws of the jurisdiction under which they are incorporated to effect such merger or consolidation.

This provision authorizes the consolidation of a nonprofit hospital plan and a nonprofit professional health service plan.

### 3. Blue Plans Excluded From Department's Review of Corporate Transactions of Licensed Insurers

■ The Department's supervisory authority over the insurance industry, including nonprofit health insurers, is strictly limited by statute. "[A]n administrative agency can only exercise those powers which have been conferred upon it by the Legislature in clear and unmistakable language." *Aetna Cas. & Sur. Co. v. Ins. Dep't*, 536 Pa. 105, 118, 638 A.2d 194, 200 (1994) (citations omitted). Thus, in order for the Department to review the merits of the Highmark consolidation, such authority must be found in the clear and unmistakable language of a Pennsylvania statute.

Significantly, the Blue Plans Act specifically exempts both nonprofit hospital plans and nonprofit professional health service plans from Pennsylvania insurance laws unless there is a specific reference in the statute to such corporations that would bring them within the scope of the insurance law in question. 40 Pa.C.S.

§§ 6103(a) [13] and 6307(a). [14]

There are only two Pennsylvania statutes that authorize the Department to review consolidations of certain types of insurance entities. The first is the General Association Act Amendments of 1990, (GAA Amendments). [15] The second is the Insurance Holding Companies Act.

### 4. GAA Amendments

Under Section 205(a) of the GAA Amendments, 15 P.S. § 21205(a), certain fundamental corporate transactions of insurance companies, including consolidations, require the Department's approval. However, the GAA Amendments do not expressly state they apply to Blue Plans Act corporations. To the contrary, "blue plans" are among those expressly *excluded.* Section 201 of the GAA Amendments, 15 P.S. § 21201, provides (with emphasis added):

> As used in this division, the term *"insurance corporation"* means any domestic insurance company of any of the classes described in.... *The term does not include any of the following:*
>
> *(1) A hospital plan corporation subject to 40 Pa.C.S. Ch. 61 (relating to hospital plan corporations).*

> *(2) A professional health service corporation subject to 40 Pa.C.S. Ch. 63 (relating to professional health services plan corporations).*
>
> ....
>
> (4) A health maintenance organization subject to the act of December 29, 1972 (P.L. 1701, No. 364), known as the Health Maintenance Organization Act.

Consequently, although the GAA Amendments authorize the Department to review consolidation of certain kinds of insurance companies, it exempts nonprofit hospital and health services plan corporations from this authority. *Kaiser.*

### 5. Insurance Holding Companies Act

The Insurance Holding Companies Act authorizes the Department to review and approve insurance company mergers and consolidations. *See* Section 1402 of the Act, 40 P.S. § 991.1402. However, as previously discussed, the Act expressly excludes from the definition of "insurer" nonprofit medical and hospital service organizations. *See* Section 1401 of the Act, 40 P.S. § 991.1401.

Also, the Insurance Holding Companies Act, a general insurance law, does not expressly provide that Blue Plans Act cor-

---

**13.** 40 Pa.C.S. § 6103, titled "**Exemptions applicable to certified hospital plan corporations,**" provides in part (with emphasis added):

> (a) **General insurance laws.**—*A hospital plan corporation holding a certificate of authority under this chapter shall not be subject to the laws of this Commonwealth now in force relating to the business of insurance,* and no statute hereafter enacted relating to the business of insurance shall apply to such a corporation unless such statute shall specifically refer and apply to a corporation subject to this chapter.

**14.** 40 Pa.C.S. § 6307, titled "**Exemptions applicable to certificated professional health service corporations,**" provides in part (with emphasis added):

> (a) **General insurance laws.**—A professional health service corporation shall be subject to regulation and supervision by the Department of Health and the Insurance Department under this chapter. *A professional health service corporation holding a certificate of authority under this chapter shall not be subject to the laws of this Commonwealth now in force relating to the business of insurance,* and no statute hereafter enacted relating to the business of insurance shall apply to such a corporation unless such statute shall specifically refer and apply to a corporation subject to this chapter.

**15.** Act of December 19, 1990, P.L. 834, *as amended,* 15 P.S. § 21101–21404.

porations are subject to its provisions. By failing to expressly address "blue plan" consolidation, the Act does not overcome the presumed exemption from oversight embodied in the Blue Plans Act, cited above. Thus, the Insurance Holding Companies Act is inapplicable to the Highmark consolidation.

For this same reason, nonprofit health plan corporations cannot be considered: "persons" as defined by Section 1401 of the Insurance Holding Companies Act; [16] "domestic insurers" under Section 1402(a)(2), [17] or "involved insurers" under Section 1403(a). [18] None of these provisions specifically refers to Blue Plans Act corporations; therefore, the presumed exemption from oversight embodied in the Blue Plans Act is not overcome.

In sum, given the multiple, clear, specific statutory provisions limiting the Department's oversight of "blue plans," the Commissioners did not err when they held the Department lacked jurisdiction over the consolidation that resulted in the formation of Highmark. As a further important consequence, the Commissioners did not err when they concluded the Department had no authority to consider the market shares of Blue Shield and Western Blue Cross in deciding whether the change of control of their Subsidiaries violated the competitive

standard of the Insurance Holding Companies Act. *See* Sections 1402(f)(1)(ii) (department shall approve merger or other acquisition of control unless it finds the change in control would substantially lessen competition in insurance in Commonwealth or tend to create a monopoly) and 1403(d)(2) (department may enter order if it finds proposed acquisition violates competitive standard), 40 P.S. §§ 991.1402(f)(1)(ii), 991.1403(d)(2).

### 6. Other Arguments

We also reject Dr. Sklaroff's argument that this Court anticipated adjudicatory review of the consolidation in our ruling on the first appeal, *Kaiser.* Rather, we transferred the matter back to the Commissioner for post-approval adjudication, without binding decision on the merits.

Similarly, we reject the contention that jurisdiction arises because Commissioner Koken wanted to review the consolidation. The Department's jurisdiction must be based on statutory authority, not the desires of its Commissioner. Further, given the Commissioners' repeated, express rulings that no jurisdiction existed to review the consolidation, this argument is at best suspect.

Having carefully examined all the arguments on this issue, we affirm the Commissioners' determinations.

**16.** Section 1401, 40 P.S. § 991.1401, defines "person" as:

An individual, a corporation, a partnership, a limited liability company, an association, a joint stock company, a trust, an unincorporated organization, any similar entity or any combination of the foregoing acting in concert. The term shall not include any joint venture partnership exclusively engaged in owning, managing, leasing or developing real or tangible personal property.

**17.** Section 1402(a)(2), 40 P.S. § 991.1402(a)(2), provides in part:

For purposes of this section, a "domestic insurer" shall include any person control-

ling a domestic insurer unless such person as determined by the department is either directly or through its affiliates primarily engaged in business other than the business of insurance.

**18.** Section 1403(a), 40 P.S. § 991.1403(a), provides:

As used in this section the following words and phrases shall have the meanings given to them in this subsection:

. . . .

"**Involved insurer.**" Includes an insurer which either acquires or is acquired, is affiliated with an acquirer or acquired or is the result of a merger.

## C. Dual Certification

### 1. Contentions

No Pennsylvania statute addresses the certificate of authority needed for a new "blue plan" which results from the consolidation of two currently certificated "blue plans," one a hospital plan and one a professional health service plan. The absence of express provision drives the parties' arguments. Each party argues that if the General Assembly intended a result different than their advocated approach, it could have expressed that intent.

Dr. Sklaroff primarily contends the Commissioners erred by allowing Highmark to hold dual certification to operate as a single entity under the certificates of authority of both a hospital plan and professional health service plan. Having originally been two corporations holding separate certificates under distinct grants of authority, Highmark can point to no authority by which it can simultaneously hold and operate under multiple certificates.

Dr. Sklaroff also argues: enabling statutes insulate hospital plans from professional health service plans, necessitating that both exist independently; given the structure of the Blue Plans Act, the Commissioners violated rules of statutory construction in reaching their conclusions on this issue; in other states, specific legislative authority was conferred prior to consolidation of comparable entities; and, language in Commissioner Koken's December 2, 2002 decision (C.R. Ex. 406) is faulty.

Highmark contends that a single consolidated nonprofit corporation may operate a nonprofit hospital plan and a nonprofit professional health service plan under the certificates of authority held by its predecessors. In particular, the Nonprofit Law expressly allows nonprofit corporations to consolidate. Nothing in the Blue Plans Act limits this authority. To the contrary, the General Assembly drafted the current Blue Plans Act to eliminate the very restriction for which Dr. Sklaroff argues. Also, other provisions of the Blue Plans Act on which Dr. Sklaroff relies do not support his conclusions.

The Department contends that Highmark's use of certificates of authority as both a hospital plan corporation and a professional health service organization is authorized by statute. Thus, Blue Shield and Western Blue Cross had express statutory authority under the Nonprofit Law to consolidate. By reason of the consolidation, Highmark possesses all property of the consolidating parties, including the certificates of authority. The Blue Plans Act does not expressly limit hospital plan corporations or professional health service corporations to a single type of authority, and the division of the Act into chapters should not be read to be an implied limitation. This is especially true in view of the deletion of such limiting language from the Blue Plans Act when it was amended. Also, the Blue Plans Act did not require Highmark to apply for a new certificate of authority to operate the plans it acquired by reason of consolidation.

### 2. Nonprofit Law

■ "Blue plans" are required to be nonprofit corporations. 40 Pa.C.S. § 6102(a), 6304(a). The Nonprofit Law, administered by the Department of State and not by the Department of Insurance, specifically authorizes nonprofit corporations to consolidate, and sets forth the procedure to be followed. 15 Pa.C.S. §§ 5921–29. All property of each corporation party to the plan of consolidation shall be taken and deemed to be transferred to the new corporation without further act or deed. 15 Pa.C.S. § 5929 (effect of merger or consolidation).

### 3. Blue Plans Act

#### a. Consolidation

██ The Blue Plans Act does not expressly address consolidation of nonprofit hospital plans and nonprofit professional health service plans. However, as previously discussed, it expressly limits the Department's oversight of those plans. As noted above, the Blue Plans Act exempts both nonprofit hospital plans and nonprofit health services plans from Pennsylvania insurance laws unless there is a specific reference in the statute to such corporations. 40 Pa.C.S. §§ 6103(a), 6307(a). Therefore, unlike any other type of insurer, consolidation of "blue plans" is made subject to Pennsylvania's corporate laws, not its insurance laws.

██ Under Pennsylvania's applicable corporate law, the Nonprofit Law, all property of each nonprofit corporation party to the plan of consolidation passes by operation of law to the new corporation. Generally, licenses issued by the Department are considered property. *See, e.g., Stone & Edwards Ins. Agency, Inc. v. Dep't of Ins.,* 161 Pa.Cmwlth. 177, 636 A.2d 293 (1994). As a result, the certificates of authority of Blue Shield and Western Blue Cross passed to Highmark as a matter of law under the Nonprofit Law. No provision in the Blue Plans Act states otherwise.

#### b. Certificates of Authority

The Blue Plans Act addresses certificates of authority for hospital plans and professional health service plans. For the following three reasons, however, we reject Dr. Sklaroff's contentions regarding the Act's implied limitation against dual certification of a single "blue plan" as both a hospital plan and a professional health service plan.

First and foremost, the Blue Plans Act contains no express limitation on the ability of a new nonprofit corporation formed by consolidation to operate under the certificates of its predecessors. Also, there is no express limitation on the ability of a "blue plan" to engage in more than one business.

Second, given the legislative history of the Blue Plans Act, the opposite conclusion prevails. In other words, because of the repeal of prior statutory language requiring "blue plans" to have a special purpose, we conclude that the General Assembly intended to forego a special purpose format.[19] 1 Pa.C.S. § 1921(c)(5) (in ascertaining legislative intent, court may look to "[t]he former law, if any, including other statutes upon the same or similar subjects);" *Commonwealth v. Bigelow,* 484 Pa. 476, 399 A.2d 392 (1979) (where section of statute contains given provision, omission of such provision from similar section is significant to show different intent).

Third, the division of the Blue Plans Act into two chapters, one for hospital plan corporations and one for professional health service corporations, does not com-

---

**19.** Section 2(d) of the former Nonprofit Hospital Plan Act or "Blue Cross Act," Act of June 21, 1937, P.L. 1948, formerly 40 P.S. § 1402(d) (repealed by the Act of November 15, 1972, P.L. 1063) provided, with *emphasis added:*

It shall be unlawful for any person, association or corporation, other than a nonprofit corporation, *especially organized for the purpose,* to establish, maintain, or operate a nonprofit hospital plan....

Section 4(40) of the former Nonprofit Medical, Osteopathic, Dental and Podiatry Service Corporation Act, or "Blue Shield Act," Act of June 27, 1939, P.L. 1125, formerly 40 P.S. 1434 (repealed by the Act of November 15, 1972, P.L. 1063) contained similar language. The General Assembly deleted the language in 1972 when it repealed the separate statutes and enacted the Blue Plans Act.

pel the conclusion of intended separation. At best, the headings of the chapters may be aids to statutory construction, but they do not control. 1 Pa.C.S. § 1924 ("headings prefixed to ... chapters ... and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof.") In this context, we conclude that the structure of the Blue Plans Act is insufficient to support an inference of intent to impliedly separate different types of "blue plans."

Having carefully considered all the arguments on this issue, we agree with the Commissioners' conclusions that current statutes do not preclude a single nonprofit corporation from simultaneously operating as both a hospital plan and a professional health services plan, provided it meets all the requirements for each type of "blue plan."

### D. Highmark's Operation under Certificates Issued to Others

#### 1. Contentions

In a related but distinct argument, Dr. Sklaroff challenges the propriety of Highmark's operation as "blue plans" without applying for and obtaining its own certificate of authority based on its own qualifications. He maintains that the certificates of Highmark's predecessors were issued specifically to them, based on their compliance. The Blue Plans Act anticipates a new application and specific approval before a certificate can be issued to or utilized by any new entity.

Relying on a decision from this Court, Highmark contends that under Pennsylvania law, a license to engage in a business, profession or occupation is a property right.[20] The Nonprofit Law expressly provides that all property of each corporation party to the plan of consolidation shall be taken and deemed to be transferred to the new corporation "without further act or deed." 15 Pa.C.S. § 5929(b). Because there is no language in the Blue Plans Act which would alter the property transfer process envisioned for nonprofit corporations, the property transfer process must be honored. Further, Highmark argues that if the right to use the property does not pass with the property, then the property has no value, rendering the cited language of the Nonprofit Law meaningless surplusage, contrary to presumed legislative intent.

The Department contends that under both the Nonprofit Law and the Blue Plans Act, Highmark succeeded to the certificates of authority of Blue Shield and Western Blue Cross by means of the consolidation. The certificates of authority, like licenses to engage in business or occupation and licenses issued by the Department, are a form of property.[21] The property rights were transferred to Highmark by operation of law with no further action required. Dr. Sklaroff's argument that Highmark must apply for a new certificate imposes an additional requirement of a "further act or deed" not required by the Nonprofit Law. In short, Highmark was not required to apply for new certificates of authority because it already possessed the certificates of Blue Shield and Western Blue Cross by virtue of the consolidation.

---

20. *Tsolo v. Foster*, 127 Pa.Cmwlth. 335, 561 A.2d 861 (1989) (revocation of license to conduct business of insurance).

21. The Department relies on various decisions, including *Telang v. Bureau of Professional and Occupational Affairs*, 561 Pa. 535, 751 A.2d 1147 (2000) (physicians have property right in medical license), *Lyness v. State Bd. of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992) (property rights protected by State Constitution include right of individual to pursue livelihood or profession), *Stone & Edwards Ins. Agency, Inc.* (same), and *Tsolo v. Foster*.

## 2. Property Rights

■ Given the procedures governing the applications for certificates of authority under the Blue Plans Act, 40 Pa.C.S. §§ 6102(e), 6304(e), the standards for granting such certificates, 40 Pa.C.S. §§ 6102(d), 6304(d), and the general prohibitions against operating a "blue plan" without certificates of authority,[22] we conclude that certificates of authority under the Blue Plans Act constitute rights to pursue a livelihood or profession. Therefore, certificates of authority are property entitled to protection of law. *Lyness v. State Bd. of Medicine,* 529 Pa. 535, 605 A.2d 1204 (1992).

## 3. Passing of Property Rights to Highmark

Furthermore, we conclude that under the clear and unambiguous terms of the Nonprofit Law, the property rights of two nonprofit corporations which consolidate pass by operation of law to the resulting nonprofit corporation "without further act or deed." 15 Pa.C.S. § 5929(b). Thus, rights under the certificates of authority of Blue Shield and Western Blue Cross passed by operation of law to Highmark.

We reject Dr. Sklaroff's arguments to the contrary, primarily because the arguments ignore the clear language of the Nonprofit Law, cited above. The clear language is not overcome by the spirit of the Blue Plans Act or by policy considerations. See 1 Pa.C.S. § 1921(b) (when words of statute are clear, the letter of it is not to be disregarded under the pretext of pursuing its spirit). Also, the clear language of the Nonprofit Law is not overcome by reference to cases involving the Liquor Code,[23] which contains different language.

## 4. Operation under Existing Certificates

Further, we conclude Highmark, as the successor by consolidation to Blue Shield

---

22. 40 Pa.C.S. § 6102(a), which requires certification of hospital plans, provides:

> General rule.—A corporation not-for-profit incorporated for the purpose of establishing, maintaining and operating a nonprofit hospital plan shall not commence business until it shall have received from the department a certificate of authority authorizing the corporation to establish, maintain and operate such a nonprofit hospital plan.

40 Pa.C.S. § 6308(a), which prohibits uncertified health services plans, provides:

> General rule.—It shall be unlawful for any person, other than a professional health service corporation holding a certificate of authority under this chapter relating to the plan being maintained or operated by such corporation, to establish, maintain or operate in this Commonwealth a nonprofit dental service plan, a nonprofit optometric service plan, or a nonprofit professional health service plan.

23. Dr. Sklaroff contends that the certificates of authority are not transferable property rights but are more in the nature of non-transferable privileges personal to the holders. He cites *In re Feitz' Estate,* 402 Pa. 437, 167 A.2d 504 (1961), for the proposition that a liquor license is a personal privilege and not a property right. He further argues that while the certificates issued to Blue Shield and Western Blue Cross may have passed to Highmark, Highmark cannot legally operate under them.

The case on which Dr. Sklaroff relies is distinguishable. In *Feitz' Estate,* the Supreme Court considered specific provisions of the Liquor Code (Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. §§ 1–101–10–1001), which allowed the holder of a liquor license to transfer it to another. The transferee could then apply to the Pennsylvania Liquor Control Board (PLCB) for approval as a licensee. Because the LCB was not required to approve the transferee as a licensee, the Court observed that there was no property right in such a license. As there are no comparable provisions for reapplication by transferees of certificates of authority in any of the statutes currently at issue, *Feitz' Estate* is inapposite.

and Western Blue Cross, was entitled to continued use of their certificates of authority to operate "blue plans." Short of dissolution or liquidation, there is no statutory provision for a cessation of authority to operate under existing certificates. *See* 40 Pa.C.S. §§ 6127 (dissolution or liquidation of hospital plan corporations), 6334 (dissolution or liquidation of professional health service plan corporations). To the contrary, the Blue Plans Act makes provision for ongoing operation under existing certificates of authority by requiring annual reports and tri-annual examinations of "blue plan" corporations. *See* 40 Pa.C.S. §§ 6125 (reports and examinations by hospital plan corporations), 6331 (reports and examinations of professional health service plan corporations). We reject Dr. Sklaroff's arguments to the contrary in the absence of any statutory provision which expressly lapses the authority to operate under an existing certificate on consolidation.

In sum, after thorough review of all the contentions on this issue, we discern no error on the part of the Commissioners.

### E. Highmark Bylaws

#### 1. Contentions

As an aspect of his challenges based on the social mission of Blue Shield, Dr. Sklaroff assigns error in the 1996 Approval Order and the 2006 Koken Order which collectively approved Highmark's bylaws. First, he contends the Highmark bylaws changed the previous bylaws of Blue Shield by deleting the authority for anyone serving as a corporate member to present special resolutions, thus choking off that method of influencing Highmark corporate policy and maintaining the social mission. Moreover, the Highmark bylaws provide no alternate mechanism for physicians advocating optimal patient care. Second, he contends Highmark's bylaws changed the manner of electing corporate members, from direct election by the full corporate membership to a nominating committee process, thereby making it more difficult for dissenting physicians to serve in that capacity. Incestuous governance is the claimed result.

Highmark contends Commissioner Koken appropriately limited her evaluation of the bylaws to the statutory standards set forth in Section 6328(b) of the Blue Plans Act, 40 Pa.C.S. § 6328(b). Highmark notes the absence of any argument that its bylaws fail to conform to statutory criteria. Because the statute contains no provision for evaluating social mission, the Commissioner properly declined such an analysis. Further, by requiring at least 50% of the governing board of a general medical service corporation to be subscribers, the General Assembly evinced an intent that the interests of subscribers, not physicians, preponderate in governance.

Starting with Dr. Sklaroff's apparent concession that Highmark's bylaws meet the letter of the law,[24] the Department explains in detail how each statutory criterion is satisfied. In addition, the Department addresses the General Assembly's intent that subscribers, not physicians, have the dominant and legally guaranteed voice on the board of directors.

#### 2. Blue Plans Act

Section 6328(b) of the Blue Plans Act, 40 Pa.C.S. § 6328(b), provides (with emphasis added);

(b) **General medical service corporation**—(1) A general medical service corporation shall be managed by a *board of not less than 21, nor more than 36 members,* all of whom shall be residents

---

**24.** Quoting from Sklaroff Revised Br., filed 10/20/06, at 64.

of this Commonwealth, *and at no time shall the board be less than 50% subscribers* who have coverage under a contract issued by the corporation, and who are generally representative of broad segments of subscribers covered under contracts issued by such corporation, *whose background and experience indicate that they are qualified to act in the interests of such subscribers* and who or whose spouse does not derive substantial income from the delivery or administration of health care.

(2) The *bylaws of every general medical service corporation shall provide appropriate procedures for the nomination and election or appointment of the directors of the corporation and the nomination and election or appointment of committees of the board in such a manner that the interests of the subscribers of the corporation will be justly and reasonable represented.*

(3) *All directors of the corporation shall be members of the corporation.*

(4) A health service doctor, who provides professional health services for the corporation's subscribers, may be a director but in no event shall be counted among the directors who represent subscribers.

(5) Every general medical service corporation shall within six months of the effective date of this act submit for review by the Insurance Commissioner and the Secretary of Health bylaws meeting the standards of this section. Whenever a general medical service corporation changes its bylaws, said change shall be submitted within 30 days to the commissioner and secretary for their review to determine whether such changes meet statutory standards of this section.

(6) In the event that the Insurance Commissioner or the Secretary of Health find, after notice to the corpora-

tion and hearing, that a general medical service corporation has not met the requirement of this section, the commissioner or secretary shall notify the corporation of the findings and order the corporation, in specific terms, to meet the requirements of this section. Such findings and order shall be subject to judicial review in the manner and within the time provided by law.

Thus, there are several statutory criteria for the bylaws of a general medical service corporation: size of board of directors (no less than 21 nor more than 36); percentage of *subscriber* directors (at least 50%); qualification of directors (only corporate member may serve as director); and, appropriate procedures for election and appointment of directors and board committees "in such a manner that the interests of the *subscribers* will be justly and reasonably represented." 40 Pa.C.S. § 6328(b).

### 3. Discussion

 No error is evident in Commissioner Koken's determination that all the statutory criteria are met. First, the bylaws meet the board size criterion. *See* C.R. E. Supp. H4 (Highmark's bylaws) at 5; Cap. R. at 1778. Second, the bylaws meet the subscriber percentage of directors criterion. *Id.* at 5–6; Cap. R. at 1778–79. Third, the bylaws meet the director qualification criterion. *Id.* at 5; Cap. R. at 1778.

Fourth, the bylaws meet the criterion for appropriate election and appointment of directors and committees. As to directors, a nominating committee recommends to the board candidates for election as a director of the corporation. *Id.* at 14; Cap. R. at 1787. The authority to elect directors is vested in the corporate members. *Id.* at 1–2; Cap. R. at 1774–75. Because at least 50% of corporate mem-

bers must be subscribers, *id.* at 4–5; Cap. R. at 1787–88, this process is appropriate to justly and reasonably represent interests of subscribers, as required by the Blue Plans Act.

Regarding committees, the bylaws provide for three classes of standing committees: governance committees; program committees; and, review committees. Members of the governance committees are appointed by the board of directors. Members and chairpersons of the program committees and the review committees are appointed by the chairperson of the board. *Id.* at 11–12; Cap. R. at 1784–85. As at least 50% of the board of directors must be subscribers, this process appropriately responds to the interests of subscribers, as required by the Blue Plans Act.

We reject Dr. Sklaroff's challenges to the 2006 Koken Order based on claimed social mission lapses in Highmark's bylaws. His arguments based on the role of physician advocates, while interesting, do not reflect the required preponderant role of subscribers in the structure of corporate governance. As his arguments have no basis in express statutory language, we decline the invitation to embrace them.

### F. Competitive Analysis for Subsidiaries

#### 1. Contentions

In her 2006 Order, Commissioner Koken concluded Dr. Sklaroff failed to meet his burden of proving the 1996 Approval Order violated the competitive analysis standards of the Insurance Holding Companies Act as to change of control of Subsidiaries.

In various portions of his written argument, Dr. Sklaroff contends the 1996 Approval Order utilized inappropriate product and geographic markets in performing the statutory calculations. Although his arguments are at times difficult to follow,

he apparently urges the use of a product market of "private health care financing" rather than "accident and health" insurance, and he urges a geographic market of "Western Pennsylvania" rather than the entire Commonwealth. According to Dr. Sklaroff, the testimony by the Highmark witness was sufficient to support these outcomes. Also, he highlights testimony as to a change of line of business by a Subsidiary, Keystone Health Plan West (KHP West), thereby supporting an argument addressed at length below that this Subsidiary was not an "already affiliated person" whose market share could be disregarded in the competitive analysis.

Highmark argues that Commissioner Kaiser appropriately relied on the definition of "market" set forth in the Insurance Holding Companies Act when she entered the 1996 Approval Order. It contends Dr. Sklaroff failed to show that Commissioner Kaiser had sufficient information to the contrary to adopt an alternative relevant product market. Also, Highmark explains why Commissioner Kaiser appropriately rejected Dr. Sklaroff's claim that "Western Pennsylvania" was the relevant geographical market.

The Department argues Dr. Sklaroff failed to produce any evidence that Commissioner Kaiser's findings concerning the appropriate product and geographical markets were erroneous. It discusses at length the testimony of Colleen Gallagher, Blue Shield's Director of Regulatory Affairs in 1995–96 (Highmark witness), explaining why her testimony as a whole supports the Commissioner's use of the statutory default market, a statewide market, rather than the more limited regional market championed by Dr. Sklaroff. The Department further addresses her testimony concerning the change in line of business by one Subsidiary, KHP West.

## 2. Insurance Holding Companies Act

Under Section 1402 of the Insurance Holding Companies Act, a change in control must be approved unless the Department finds certain enumerated conditions present. 40 P.S. § 991.1402(f)(1). The condition relevant to this issue is the competitive impact of the proposed change of control over Subsidiaries. 40 P.S. § 991.1402(f)(1)(ii). The competitive analysis is described in more detail in Section 1403(d)(2) of the Act, 40 P.S. § 991.1403(d)(2), and is based largely on the relative market shares of the involved insurers.

Section 1403(d)(2) of the Insurance Holding Companies Act contains the following guidance in selecting an appropriate market for analysis:

> (iii) For the purposes of this paragraph:
>
> . . . .
>
> (B) The term *"market"* means the relevant product and geographical markets. In determining the relevant product and geographical markets, the department shall give due consideration to, among other things, the definitions or guidelines, if any, promulgated by the NAIC and to information, if any, submitted by parties to the acquisition. *In the absence of sufficient information to the contrary, the relevant product market is assumed to be the direct written insurance premium for a line of business, such line being that used in the annual statement required to be filed by insurers doing business in this Commonwealth and the relevant geographical market is assumed to be this Commonwealth.*

40 P.S. § 991.1403(d)(2)(iii)(B) (emphasis added). Thus, the product market is assumed to be the line of business declared in the filed annual statement. Also, the geographic market is assumed to be Pennsylvania. These market assumptions prevail in the absence of sufficient information to the contrary.

## 3. Discussion

■■■ In the 1996 Approval Order, Commissioner Kaiser followed this provision. Using the 1994 Annual Statements of the Subsidiaries, she defined the relevant product market as the reported line of business, accident and health insurance. The Commissioner used the entire Commonwealth as the relevant geographical market, noting that data reported on the Annual Statements is reported for the entire Commonwealth, not broken down by region or county. She did not find "sufficient information to the contrary" that would support a deviation from the assumed statewide market. *See* C.R. Ex. Supp. H3 (1996 Approval Order) at 27–28; Cap. R. at 1748–49.

We reject Dr. Sklaroff's contentions regarding the existence of information sufficient to compel different determinations regarding relevant product and geographical market. The Highmark witness' reference to the relevant product as "health insurance" instead of "health and accident insurance" does not require appellate relief. This is because the reference is so similar to the reported line of business as to corroborate that assumed market, and it is not so different as to compel some other conclusion. Similarly, the Highmark witness' reference to her experience as an employee of Blue Shield in the Western Blue Cross service area of 29 western Pennsylvania counties does not as a matter of law require a departure from the statutorily presumed statewide market. To the contrary, the witness' testimony as a whole was consistent with the findings supporting this aspect of the 1996 Approval Order.

As to the testimony of the Highmark witness which supposedly impacts a determination of whether KHP West was an

"already affiliated person," the testimony was ambiguous about a change of KHP West's line of business. Notes of Testimony (N.T.), 12/20/2002 at 241, 249; Sklaroff Reproduced Record (Sklaroff R.) at 612a, 619a–20a. Because of the ambiguity, no error is discernible in a decision which does not incorporate the urged finding. In short, the quality of the evidence is insufficient to compel a different result.

## G. Other Challenges to 2006 Koken Order

Dr. Sklaroff raises other challenges to the sufficiency of the 2006 Koken Order. In particular, he claims the order dismissed without discussion facts established at the hearing regarding the social mission concern as it affected the Highmark bylaws, and dismissed without discussion facts established at the hearing regarding the monopoly concern. He also claims Commissioner Koken ignored his post-hearing and reply briefs.

For reasons stated at length above, we discern neither reversible error nor abuse of discretion in the ruling on Highmark's bylaws. Also, Commissioner Koken's discussion was sufficient for appellate review. Therefore, no prejudice is evident in Commissioner Koken's failure to further discuss Dr. Sklaroff's arguments on the issue.

Similarly, for reasons discussed elsewhere, neither reversible error nor abuse of discretion is apparent in the rulings on jurisdiction and competitive analysis. Again, Commissioner Koken's discussion was sufficient for appellate review. As a result, Commissioner Koken's failure to discuss more fully Dr. Sklaroff's contentions on monopoly does not support the requested relief on appeal.

 Finally, Commissioner Koken's refusal to adopt Dr. Sklaroff's proposed conclusions was not error. Also, whether or not Commissioner Koken specifically referenced Dr. Sklaroff's post-hearing brief and reply brief is not material to our review. It was not necessary for Commissioner Koken to refute each and every one of the swarm of contentions raised by Dr. Sklaroff, as long as she explained the dispositive findings and conclusions she reached sufficiently for this Court to review them. *See Krebs Chrysler–Plymouth, Inc. v. State Bd. of Vehicle Mfrs., Dealers and Salespersons,* 655 A.2d 190 (Pa.Cmwlth.1995) (administrative agency not required to address each and every allegation of a party in its findings, findings need only be enough to enable reviewing court to determine relevant questions). This Court considered all Dr. Sklaroff's arguments, and, as explained more fully elsewhere, we find no merit in any of them.

## H. Errors by Hearing Officer

Dr. Sklaroff challenges numerous discovery and evidentiary rulings against him. Generally, questions concerning the admission or exclusion of evidence are matters within the lower tribunal's discretion and will not be disturbed absent an abuse of discretion. *Subaru of Am., Inc., v. State Bd. of Vehicle Mfrs., Dealers and Salespersons,* 842 A.2d 1003 (Pa.Cmwlth.2004).

Because of the lower tribunal's broad discretion, exclusion of evidence alone may not constitute a procedural defect. *Leeward Const., Inc. v. Dep't of Envtl. Prot.,* 821 A.2d 145 (Pa.Cmwlth.2003). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Lock v. City of Phila.,* 895 A.2d 660 (Pa. Cmwlth.2006); *Peden v. Gambone Bros. Dev. Co.,* 798 A.2d 305 (Pa.Cmwlth.2002). Stated differently, the order of an administrative agency will not be disturbed on appeal for harmless error. *Pa. Game*

*Comm'n v. Bowman*, 81 Pa.Cmwlth. 381, 474 A.2d 383 (1984).

### 1. July 5, 2000 Order: Anti–Competitive Effect

While much of his written argument on this issue is impenetrable, Dr. Sklaroff apparently challenges the Hearing Officer's July 5, 2000 Order (C.R. Ex. 204; Cap. R. at 590–609) as improperly excluding evidence of the anti-competitive effect of the consolidation. At times, Dr. Sklaroff refers to the July 2000 Order as precluding consideration of anti-trust concerns, although he does not cite federal anti-trust authority. He also complains that Hearing Officer failed to sufficiently explain his ruling, thereby foreclosing corrective action.

Highmark contends the order appropriately struck from Dr. Sklaroff's prehearing statements paragraphs relating to aspects of the consolidation beyond the jurisdiction of the Department. None of the stricken material related to the competitive standard as applied to the Subsidiaries.

The Department argues that the July 2000 Order striking off portions of Dr. Sklaroff's pre-hearing statements was consistent with the 1999 Koken Order regarding jurisdiction over the consolidation of Blue Shield and Western Blue Cross into Highmark, and it was not an abuse of discretion.

For reasons previously discussed, we discern no error in the Commissioners' determinations regarding the extent of jurisdiction over the consolidation. Also, it was well within the discretion of Hearing Officer to restrict information where any probative value would be outweighed by the danger of confusion of the issues, considerations of undue delay or waste of time. *See* Pa. R.E. 403. After careful review, neither reversible error nor abuse of discretion is apparent in Hearing Officer's action limiting proceedings to areas over which the Department enjoyed jurisdiction.

### 2. July 5, 2000 Order: Burden of Proof

In addition to the foregoing, Hearing Officer, in his July 2000 Order reconsidered and confirmed the 1999 Koken Order placing the burden of proof at the planned hearing on intervenors, including Dr. Sklaroff.

Focusing on the *de novo* nature of the post-approval adjudicatory process and the claimed invalidation of the 1996 Approval Order, Dr. Sklaroff contends Hearing Officer improperly allocated the burden of proof to intervenors such as himself instead of to the Department. He argues the Department did not perform its duties in regard to the 1996 Approval Order with due diligence, thereby casting doubt on the Order's validity. Also, he claims that this Court's decision in the first appeal, *Kaiser*, recognized the lapses of the preceding efforts and compels the conclusion that the post-approval adjudicatory process should have proceeded as though the 1996 Approval Order did not exist.

Highmark counters that the 1996 Approval Order was a valid order when Dr. Sklaroff intervened to challenge it. As a party contesting an existing administrative order, Dr. Sklaroff bore the burden of going forward with evidence and the ultimate burden of persuasion.

We see no merit in Dr. Sklaroff's position. As discussed above, we reject Dr. Sklaroff's premise that this Court invalidated the 1996 Approval Order during our review in the first appeal, *Kaiser*. Consequently, we reject his urged conclusion that the post-adjudicatory hearing process proceeded without an existing ap-

proval. Under these circumstances, those asserting that the 1996 Approval Order did not meet the applicable statutory standards bore the burden of proof. *Pa. Game Comm'n v. Dep't. of Envtl. Res.*, 97 Pa.Cmwlth. 78, 509 A.2d 877 (1986), *aff'd*, 521 Pa. 121, 555 A.2d 812 (1989) (party protesting issuance of permit has burden of coming forward with evidence, and ultimate burden of proof remains at all times with protesting party); *Comm. to Preserve Mill Creek v. Sec'y of Health*, 3 Pa. Cmwlth. 200, 281 A.2d 468 (1971) (in its order, Commonwealth Court placed burden upon aggrieved property owners to specify how permit failed to conform to departmental standards, at risk of dismissal).

### 3. November 2, 2001 and March 25, 2002 Discovery Orders

Dr. Sklaroff asserts abuse of discretion in Hearing Officer's decision to limit to 50 the number of documents he could request in discovery. He also complains that two document requests were unfulfilled, and Hearing Officer denied a follow-up request for discovery.

Highmark contends that there is no right to civil trial-type discovery in administrative proceedings and that Hearing Officer was generous in allowing discovery of 50 documents.

The Department argues that while some of the discovery requests were couched in terms of Subsidiaries, the practical effect was to require disclosure of information solely related to the market power of the consolidating entities. Such discovery was beyond the scope of the 1999 Koken Order.

Dr. Sklaroff fails to explain how the denied discovery would change the outcome of the administrative hearing process. Without a coherent explanation of prejudice, no reversible error is discernible. *Lock; Peden.*

No abuse of discretion is evident in a reasonable limit to the number of discovery requests or in a requirement for some explanation of the relevance of requested discovery. *Compare* M.D. Pa. L.R. 33.3, 36.1 (Local Rules of the United States District Court for the Middle District of Pennsylvania limiting to 25 number of interrogatories and requests for admissions as a matter of right), *with* Dauphin County Local Rules 4005, 4014 (limiting to 40 number of interrogatories and requests for admissions as a matter of right). Also, in administrative proceedings there is no right to the extent of discovery allowed in civil procedures in trial courts. *UGI Utils., Inc. v. Unemployment Comp. Bd. of Review*, 851 A.2d 240 (Pa.Cmwlth.2004).

### 4. November 27, 2002 Order: Social Mission

Shortly before the *de novo* hearing, Hearing Officer entered an order which in part precluded Dr. Sklaroff from presenting evidence on whether Highmark fulfilled its social mission. *See* C.R. Ex. 403; Cap. R. at 1043–53. Hearing Officer stated that Dr. Sklaroff failed to explain how the alleged physician disenfranchisement or effect on social mission occasioned by Highmark's bylaws related to the standards of the Blue Plans Act, 40 Pa.C.S. § 6328 (bylaw requirements for general medical service corporation). *Id.*

Dr. Sklaroff decries this decision as having a chilling effect on his planning for the hearing, although his rationale for appellate relief is unclear. He asserts Hearing Officer ignored his submissions which were replete with "incestuous-structure" and "physician-advocacy" themes explaining his position.

Highmark contends that Dr. Sklaroff failed to explain how the excluded informa-

tion related to the statutory requirements for Highmark's bylaws.

The Department asserts Hearing Officer did not err in excluding evidence of Highmark's post-consolidation conduct relative to its social mission because the issue had no relevance to the change in control of the Subsidiaries.

▇▇▇ Given our previous discussion regarding Dr. Sklaroff's social mission argument, it was not an abuse of discretion to preclude this information as having a potential to confuse and delay which outweighs any probative value. *See* Pa. R.E. 403. Also, Dr. Sklaroff's fails to explain how his chilled planning changed the outcome. This lack of explanation impedes our ability to discern prejudice.

### 5. November 27, 2002 Order: "Already Affiliated Person"

#### a. Background

Prior to the change of control, Blue Shield and Western Blue Cross each owned 50% of one Subsidiary, KHP West. *See* C.R. Ex. 370 (Order Adopting Stipulated Facts) at ¶¶ 166–67; Cap. R. at 965. After the consolidation, Highmark owned 100% of KHP West. *Id.*

Hearing Officer's order shortly before the *de novo* hearing determined that KHP West was exempt from the application of the competitive standard as an "already affiliated person" under Section 1403 of the Insurance Holding Companies Act.[25] As a result, Hearing Officer barred as irrelevant evidence of KHP West's market share for purposes of determining whether error was present in the analysis of the change of control of the Subsidiaries for the 1996 Approval Order.

#### b. Definitions

Section 1401 of the Insurance Holding Companies Act, 40 P.S. § 991.1401, defines "**Affiliate[,]**" as follows:

A person that directly or indirectly through one or more intermediaries controls or is controlled by, or is under common control with, the person specified.

Further, Section 1401 defines "**Control,**" "**controlling,**" "**controlled by**" and "**under common control with[,]**" as follows:

The possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services or otherwise, unless the power is the result of an official position with or corporate office held by the person. *Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote or holds proxies representing ten per centum (10%) or more of the voting securities of any other person. This presumption may be rebutted by a showing that control does not exist in fact.* The Insurance Department may determine, after furnishing all persons in interest notice and opportunity to be heard and making specific findings of fact to support such determination, that control exists in fact, notwithstanding the absence of a presumption to that effect.

*Id.* (emphasis added). Thus, control is presumed to exist if a person owns more than 10% of the voting securities of another person. The presumption of control, and therefore of affiliation, may be rebutted by

---

25. Section 1403 of the Act, which defines the term "**Involved insurer**" as used in Section 1403(d)(2)'s competitive standard analysis, provides that "[t]his section shall not apply to … [t]he acquisition of already affiliated persons." *See* 40 P.S. § 991.1403(b)(2)(iv).

a showing that control does not in fact exist.

### c. Contentions

Dr. Sklaroff raises legal and factual arguments. Legally, he contends that the "already affiliated" exemption from competitive analysis stated in Section 1403 of the Insurance Holding Companies Act does not apply to proceedings under Section 1402, 40 P.S. § 991.1402, pertaining to acquisition of control over Subsidiaries. Factually, he claims that he did not need to produce evidence to rebut the statutory presumption of control because the presumption is clearly rebutted by the undisputed facts of equal, non-dominant authority over KHP West prior to consolidation.

Highmark urges the application of the statutory presumption of control, and thus of affiliation, because ownership of securities exceeds 10%. It highlights Dr. Sklaroff's failure to offer any proof that Blue Shield or Western Blue Cross did not control KHP West despite their respective 50% interest in that Subsidiary. Highmark also contends the issue is a red herring because Commissioner Kaiser actually included KHP West's market share in her competitive analysis and because Dr. Sklaroff fails to explain how this ruling caused prejudice.

The Department refutes Dr. Sklaroff's legal argument by reference to Section 1402(f)(1)(ii)(B) of the Insurance Holding Companies Act,[26] which expressly incorporates the competitive standard of Section 1403 into the process for evaluating change in control over Subsidiaries. The Department responds to Dr. Sklaroff's factual argument by contesting that the 50/50 ownership arrangement of KHP West overcomes the statutorily presumed control by either entity. Also, the Department offers a common sense analysis: since each of the two consolidating corporations owned 50% of KHP West before the consolidation, and the resulting corporation, Highmark, owned 100% after the consolidation, there was no practical change of ownership that needed to be analyzed.

### d. Discussion

■ Dr. Sklaroff fails to explain how he was prejudiced by this ruling. In particular, he fails to describe how the result would change if the KHP West market share had been taken into consideration for the 1996 Approval Order. Because he fails to establish prejudice, no reversible error is evident. *Lock*; *Peden.*

### 6. Hearing: Refusal of Continuance

■ After years of discovery, motions practice and pre-trial practice, the hearing was scheduled to begin December 19, 2002. On the eve of the hearing, Dr. Sklaroff asked for a continuance because his eco-

---

**26.** Section 1402(f)(1)(ii), 40 P.S. § 991.1402(f)(1)(ii) provides (with emphasis added):

(f)(1) The department shall approve any merger or other acquisition of control referred to in subsection (a) unless it finds any of the following:

. . . . .

(ii) *The effect of the merger or other acquisition of control would be to substantially lessen competition in insurance in this Commonwealth or tend to create a monopoly therein. In applying the competitive standard in this subparagraph:*

(A) the informational requirements of section 1403(c)(2) and the standards of section 1403(d)(2) shall apply;

(B) *the merger or other acquisition shall not be disapproved if the department finds that any of the situations meeting the criteria provided by section 1403(d)(3) exist;* and

(C) the department may condition the approval of the merger or other acquisition on the removal of the basis of disapproval within a specified period of time.

nomic expert witness was not available. When it became apparent that the expert witness was never going to volunteer an opinion, Dr. Sklaroff sought a one-month continuance to obtain a new, unidentified expert. The request was refused.

Dr. Sklaroff contends he was prejudiced by Hearing Officer's decision which precluded presentation of antitrust data "accrued during prior years." He argues, given the length of the proceedings, one month was a modest accommodation. He suggests Highmark was treated more favorably when it requested a continuance.

Reviewing in detail the history of Dr. Sklaroff's disclosures regarding proposed expert evidence, both Highmark and the Department contend that Hearing Officer did not abuse his discretion in denying another accommodation. To the contrary, Hearing Officer exhibited extraordinary patience. In addition, Highmark explains how its request for continuance, which was made earlier and did not request permission to obtain a new expert, was different.

■ The power to grant or refuse a continuance is an inherent power of an administrative agency which is subject to review only upon a showing of abuse of discretion. *Hainsey v. Pa. Liquor Control Bd.*, 529 Pa. 286, 602 A.2d 1300 (1992). Given the long-standing requirement of pre-hearing expert disclosure, the repeated problems in obtaining from Dr. Sklaroff appropriate expert disclosure, the need to resolve the long-running controversy, and the temporal and substantive complications inherent in the introduction of a new, unnamed expert at the hearing stage of the proceedings, we discern no abuse of discretion.

### 7. Hearing: Preclusion of Testimony by Dr. Sklaroff

#### a. Contentions

In this argument, Dr. Sklaroff contends Hearing Officer improperly limited his tes-

timony. He complains he was not allowed to opine regarding his appreciation of the antitrust issues, as with "the regional nature of the Blue Cross contracts (wedded to hospital locales)," despite his experience as a regional coordinator of a national union, and as a representative of a wrongfully terminated union member. Sklaroff Reply Br. at 22. Also, it was improper to limit testimony about his negative experience with Blue Shield involving a wholly-owned company, Inter–County Insurance Company, which tended to demonstrate "monopolistic practice [which] portended proliferation of more exertions of raw market-power." Sklaroff Revised Br., filed 10/20/06, at 56. Dr. Sklaroff briefly complains about other limits on his testimony.

Highmark asserts opinion evidence on matters of market and competition from Dr. Sklaroff was properly precluded for various reasons. First, he was never identified as a witness who would offer opinions, and he was belatedly permitted to testify only upon the stipulation that his testimony would be limited to facts. Second, he was not qualified to offer expert opinion because he lacks a degree in economics or statistics, he was never employed in the insurance industry, and he never worked for an insurance regulator.

The Department contends Dr. Sklaroff, as a lay witness, was competent to testify only as to matters within his personal knowledge and experience. Hearing Officer appropriately enforced the limits between fact and expert testimony as it relates to Dr. Sklaroff's attempt to testify about product and geographical markets for healthcare. Thus, while some testimony was permitted about Dr. Sklaroff's experiences and understanding of terms, limits were properly placed on Dr. Sklaroff's thoughts about errors in selection of prod-

uct and geographical markets for the 1996 Approval Order. Also, it was proper to preclude Dr. Sklaroff from testifying about his experience with Blue Shield, since the Department did not have jurisdiction over the consolidation of Western Blue Cross and Blue Shield.

### b. Discussion

■ After careful review of the transcript and of all the written argument, we totally reject these assignments of error, for several reasons.

First, it is undisputed that Dr. Sklaroff was never identified as an expert witness. Indeed, he was not identified as any sort of witness until the week before the hearing. *See* C.R. Ex. 417 (Sklaroff Final Pre–Hearing Statement) at 55. Under these circumstances, it was proper to preclude expert opinion from him.

Second, it was not an abuse of discretion to determine that the proffered testimony regarding insurance products in the healthcare field and geographic markets in the healthcare field required scientific, technical or other specialized knowledge and was thus beyond lay testimony. *See* Pa. R.E. 701. Also, given the manner of Dr. Sklaroff's permitted testimony, it was well within Hearing Officer's discretion to determine the precluded testimony would not be "helpful to a clear understanding of the witness' testimony or a determination of a fact in issue...." *Id.*

Third, some of the testimony at issue was properly precluded because any probative value as lay testimony was far outweighed by the danger of confusion of the issues. *See* Pa. R.E. 403. This is especially true of Dr. Sklaroff's interest in describing a negative experience with Blue Shield. In this regard, we specifically reject Dr. Sklaroff's argument that pursuant to 2 Pa. C.S. § 505 (administrative agencies not bound by technical rules of evidence) con-

cepts of legal relevance are suspended. To the contrary, the hearing in this case demonstrates the need for a hearing officer to maintain some reasonable focus on helpful information.

For all these reasons, we discern no reversible error arising from Hearing Officer's rulings excluding testimony by Dr. Sklaroff.

### 8. Hearing: Limits on Use of Notes, Optimization of Testimony

■ In a related but distinct issue, Dr. Sklaroff complains that he was not allowed to testify using notes prepared before the hearing. He contends the notes were intended to ensure generation of a complete record, and he disputes Hearing Officer's characterization of the notes as "prepared testimony." Also, he complains that he was prevented from "correlat[ing] the contents of his orientation (as a Blue Shield Corporate Member) to stipulated facts related to the provision of Medicare and Medicaid 'managed care' services." Sklaroff Revised Br., filed 10/20/06, at 57. He claims this had a chilling effect on his testimony.

Highmark contends that Hearing Officer properly required Dr. Sklaroff to give his prepared notes to his lawyer and not have them before him during his testimony. Highmark notes that there was no limitation on the lawyer's use of the notes during his questioning of his client, Dr. Sklaroff. As to the testimony regarding Medicare and Medicaid, Highmark contends that no prejudice is evident because Dr. Sklaroff later testified on the subject.

We reject Dr. Sklaroff's arguments as meritless. Because Dr. Sklaroff's lawyer had use of the notes during testimony, and no foundation was laid for their further use by Dr. Sklaroff, neither error nor abuse of discretion is evident. *Solomon v. Baum,* 126 Pa.Cmwlth. 646, 560 A.2d 878 (1989)

(proponent of use of memorandum failed to establish inadequacy of witness' recollection). *See also McNair v. Commonwealth*, 26 Pa. 388 (1856) (once witness has refreshed his recollection, memorandum should be put aside); *Pa. Trial Guide, Evidence*, § 4.9 (4th revised ed., 2004). Also, because Dr. Sklaroff later testified about subjects that were initially foreclosed, no prejudice is evident. *See* C.R. Ex. 73 (1999 Koken Order) at 20; Cap. R. at 294. *Lock; Peden.*

### 9. Hearing: Hearing Officer Bias

Dr. Sklaroff challenges Hearing Officer's impartiality, citing an exchange where, "[a]t the behest of Highmark's attorney, the Presiding Officer admitted that probing the subscription-breakdown of PBS any further 'is not going to be helpful to the Commissioner.'" Sklaroff Revised Br., filed 10/20/06, at 61. He contends this ruling had a chilling effect on his lawyer's further offers of evidence. Dr. Sklaroff also offers as examples other rulings previously discussed.

Highmark contends any issue of bias is waived for failure to raise bias at the hearing or with the Commissioner.

There is no merit in Dr. Sklaroff's contention of bias. As explained above, the record reveals nothing other than Hearing Officer's continuing attempts to keep the proceedings focused on information more probative than confusing. *See* Pa. R.E. 403. No bias is evident.

### I. Other Issues

We reviewed all the other issues addressed by Dr. Sklaroff, including those mentioned only briefly or in footnotes. We discern no merit in any of them.

### V. Capital's Appeal

In its petition for review, Capital raises two primary issues. Capital asserts Commissioner Koken erred in concluding the combination of Western Blue Cross and Blue Shield, the two largest health plans in Pennsylvania, met the Insurance Holding Companies Act competitive standard test. Capital also asserts Commissioner Koken erred in permitting Highmark, a single legal entity, to possess dual certificates of authority under the Blue Plans Act, thus enabling Highmark to operate simultaneously as both a nonprofit hospital plan and a nonprofit professional health service plan.

Pursuant to Pa. R.A.P.1972(7), Highmark filed an application to quash Capital's petition for review. Highmark argues Capital's appeal must be dismissed for lack of standing, failure to exhaust administrative remedies, and for reasons of administrative finality. Also, Highmark and the Department assert Capital waived any issues not already raised by Dr. Sklaroff because it failed to intervene in the post-approval hearing. Further, Highmark and the Department request this Court to disregard Capital's challenges to Commissioner Koken's competitive standard analysis based on documentary evidence outside the certified record.

 We conclude Capital lacks standing. We therefore resolve this appeal on that basis without discussion of the other issues raised in Capital's appeal.

### A. Pre–Argument Order

In September 2006, in a pre-argument order, a single judge of this Court denied Highmark's motion to quash. However, although he did not quash Capital's petition for review, he noted Highmark's assertion that Capital's failure to intervene in the post-approval hearing "may arguably implicate the foundation on which [Capital] asserts their aggrieved status." *Capital BlueCross v. Ins. Dep't*, (Pa. Cmwlth. No. 1215 C.D. 2006, order filed

September 7, 2006) at 1, n. 1. He further stated, "we believe all of the foregoing can best be addressed on the merits of the petition for review...." *Id.*

Citing the language of the single judge order, Highmark renews its application to quash.[27] Our pre-argument ruling did not foreclose further consideration of Highmark's standing and waiver arguments, and indeed invited consideration by the Court *en banc.* This is understandable, given the complexity and interrelation of procedural and substantive issues here, which make it difficult to address the standing issue in isolation. Accordingly, we revisit the standing argument now.

### B. 2 Pa.C.S. § 702

In responding to Highmark's application to quash, Capital asserts standing to appeal the 2006 Koken Order as an "aggrieved person" under 2 Pa.C.S. § 702, which provides:

> Any person aggrieved by an adjudication of a Commonwealth agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals....

Capital primarily relies on *In re Application of El Rancho Grande, Inc.,* 496 Pa. 496, 437 A.2d 1150 (1981), holding that liquor licensees could appeal the grant of a license to another, although they did not formally intervene in the application proceedings before the administrative agency. Capital also cites *Pennsylvania Association of Independent Insurance Agents v. Foster,* 150 Pa.Cmwlth. 572, 616 A.2d 100

(1992) (hereinafter "*PAIIA*") and *Pennsylvania Automotive Association v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988), two Commonwealth Court decisions applying *El Rancho Grande.* In both *PAIIA* and *Pennsylvania Automotive Association,* this Court recognized that the financial interests of a direct competitor may confer standing.

### C. Case Law: Non–Participation at Agency Level

Prior to judicial resolution of a dispute, an individual must as a threshold show that he has standing to bring the action. *Pittsburgh Palisades Park, LLC v. Commonwealth,* 585 Pa. 196, 888 A.2d 655 (2005). The traditional concept of standing focuses on the idea that a person who is not adversely impacted by the matter he seeks to challenge does not have standing to proceed with the court system's dispute resolution process. *Id.* The purpose of the standing requirement is to guard against improper litigants by requiring some proof in the interest in the outcome that surpasses the common interest of all citizens. *Citizens Against Gambling Subsidies, Inc. v. Pa. Gaming Control Bd.,* 591 Pa. 312, 916 A.2d 624 (2007).

Given Capital's non-participation at the agency level, we start our analysis with an examination of our Supreme Court's recent decision in *Citizens Against Gambling Subsidies.* In that case, an individual and an organization that opposed the use of gaming revenues to subsidize slot machine licenses filed a petition for review of the issuance of a conditional slot machine li-

---

**27.** Although we will not generally reconsider our rulings on pre-argument motions, reconsideration may be appropriate where judicial economy would best be served by squarely addressing the issues raised. *See Larocca v. Workmen's Comp. Appeal Bd. (The Pittsburgh Press),* 140 Pa.Cmwlth.192, 592 A.2d 757 (1991) (although single-judge order denying motion to quash would not ordinarily be reconsidered by *en banc* panel, importance of issue and interests of judicial economy may weigh in favor of squarely addressing issues raised despite procedural irregularity).

cense. The licensee intervened in the proceedings and applied for summary relief based on the petitioners' lack of standing. The petitioners did not intervene in the proceedings before the administrative agency.

The Supreme Court quashed the appeal, concluding petitioners lacked standing. In doing so, the Court rejected an argument based on *El Rancho Grande* similar to the contention raised here. The Court specifically concluded "that [p]etitioners lacked standing because they failed to intervene in the administrative proceedings...." 591 Pa. at 318, 916 A.2d at 627. The opinion also stated:

> [B]y virtue of Section 702 of the Administrative Agency Law, neither party status nor traditional aggrievement is necessary to challenge actions of an administrative agency. Rather, standing to appeal administrative decisions extends to "persons," including non-parties who have a "direct interest" in the subject matter, as distinguished from a "direct, immediate, and substantial" interest. *A direct interest requires a showing that the matter complained of caused harm to the person's interest.*
> ...

*Id.* at 319, 916 A.2d at 628 (emphasis added). As to the additional issue of whether taxpayer standing can be invoked to support a non-party appeal of an agency action absent intervention at the agency level, the Court stated:

> We have determined that it cannot.... Taxpayer standing has been considered by this Court in various contexts, *but it is generally applied as a basis to support a challenge before a court or agency having original jurisdiction, and not as a justification for an initial entry onto the record of an existing adjudicative matter for the first time via the filing of an appeal.* We agree with the Board and Intervenor that permitting *an appeal based on taxpayer standing alone absent intervention in the administrative proceedings is inconsistent with orderly rules of procedure and would foster untenable impracticalities in terms of the development of an essential record for consideration on appeal.* *See generally* Darlington, et al., Pennsylvania Appellate Practice 2D § 501:7 ("[I]t behooves an individual or group that is interesting [sic] in issues in a matter pending in the Pennsylvania courts or agencies to attain intervenor status at the lower level as soon as possible. *The failure to attain intervenor status obviates the ability to file an appeal.*").... Finally, it has always been understood that the right to appeal under Article V, Section 9 of the Pennsylvania Constitution is effectuated through compliance with reasonable, orderly procedures.

*Id.* at 320–21, 916 A.2d at 629 (citations omitted).

The decision in *Citizens Against Gambling Subsidies* was followed a few months later by a similar opinion in *Society Hill Civic Association v. Pennsylvania Gaming Control Board*, 593 Pa. 1, 928 A.2d 175 (2007). In that case the Supreme Court again concluded petitioners who failed to intervene in proceedings before the administrative agency lacked standing. The Court decided the result "is in accord with our finding in *Citizens* that permitting an appeal absent intervention in the proceedings before the Board is 'inconsistent with orderly rules of procedure and would foster untenable impracticalities in terms of the development of an essential record for consideration on appeal.'" 928 A.2d at 183 (citation omitted).

### D. Case Law: Competitor Standing

In *El Rancho Grande*, the competitors did not formally intervene, but they partic-

ipated in administrative hearings. Indeed, the record showed one or more of the competitors would be driven out of business if the additional license was granted.

In *Pennsylvania Automotive Association,* the petitioner, an association representing car dealers and asserting competitor standing to appeal participated in the agency proceedings and presented evidence of financial harm to car dealers flowing from the agency action.

As indicated by these cases, persons asserting a direct interest in the agency action based on financial harm for purposes of an appeal under 2 Pa.C.S. § 702 must assert such a claim at the agency level and offer proof of harm. *See also PAIIA* (the fact that a party was granted intervention at the agency level weighs in favor of conclusion the party has standing to appeal).

Conversely, in *Nernberg v. City of Pittsburgh,* 153 Pa.Cmwlth. 219, 620 A.2d 692 (1993), we held that objectors who chose not to appear at a public zoning hearing and establish competitor standing to challenge a conditional use approval waived the opportunity to do so. Absent evidence to support a claim the objectors were aggrieved by the adjudication or had a direct interest in it, no basis existed for a finding that the objectors had standing to appeal. "Even if the objectors might otherwise have had standing, they failed to seize the moment by presenting evidence at the public hearing." 620 A.2d at 697. Moreover, in *Nernberg,* we recognized that in certain cases, such as disappointed bidder cases, "competitive injury is never sufficient, in and of itself, to give rise to standing." *Id.* at 696.

Our recent decision in *Pennsylvania Bankers Association,* 893 A.2d 864, is also instructive on what is required to establish competitor standing to challenge agency action. In *Pennsylvania Bankers Association,* banks which assert-ed standing based on competitive harm were permitted to intervene and participate in administrative hearings; however, they never offered proof of harm to their interests caused by the proposed administrative action. This Court recognized that although the financial interests of a competitor may constitute an interest necessary to confer standing, such harm will not be presumed. Absent an independent statutory basis for standing, a complaining party must establish a direct interest in an agency action by presenting evidence of causation of harm to its financial interest by the agency action. We stated:

The problem presented here is that Banks did not establish an aggrieved status because they did not prove a direct interest. Specifically, they did not show causation of harm to their interests occasioned by the expansion of Credit Unions' membership fields, despite an opportunity to do so.

Banks argues that potential lost profits represent a discernible adverse effect upon which standing may arise, and they rely on *Pennsylvania Automotive Ass'n v. State Bd. of Vehicle Mfrs., Dealers and Salespersons,* [121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988)]. In that case, however, a hearing was held and the complaining party, a competitor, "presented economic testimony that the [contested program] would result in a reduced rate of return for dealers." *Id.* at 1044. Therefore, nothing in that opinion or subsequent cases which rely on it supports a presumed harm; rather, that opinion supports the conclusion that while the financial interests of a competitor may constitute an interest necessary to confer standing, proof of that harm may be necessary. There is none here.

893 A.2d at 870.

We also rejected the banks' contention that they need not show harm because the

legal interest they sought to protect, fair competition with credit unions, was protected by statute. More particularly, we determined nothing in the Credit Union Code [28] provided banks with a statutory basis to intervene in agency proceedings under the Code. We further determined Section 103 of the Banking Code of 1965,[29] which states that one of its purposes is to provide the opportunity for banks to compete with other financial institutions, does not provide the banks with a statutory basis for standing.

■ In sum, absent an independent statutory basis for standing, a litigant asserting competitor standing to appeal an agency action must establish a direct interest in it by presenting evidence of causation of harm to its financial interest by the agency action. *Pa. Bankers Ass'n.*

### E. Discussion

#### 1. Petitions to Intervene

As discussed above, Commissioner Koken's September 1997 order, published as a public notice in the *Pennsylvania Bulletin,* notified PSIM, Dr. Sklaroff, and any other interested persons seeking to challenge the 1996 Approval Order to file a petition to intervene on or before October 27, 1997. The order required the petitions to clearly state:

a. The grounds of the proposed intervention in the [1996 Approval Order];

b. The facts relied upon by the petitioner from which the nature of the alleged right or interest of the petitioner can be determined;

c. The position of the petitioner in the proceeding so as to fully and completely advise parties and the agency as to the specific issues of fact or law contained in the [1996 Approval Order] to be raised or controverted by the petitioner;

d. The specific relief sought by the petitioner;

e. Appropriate reference to the statutory or regulatory provision(s), or other authority relied upon for relief; and

f. Any other information relevant to the matter(s) to be raised or controverted, the interest of the petitioner in these matter(s), and the relief sought.

C.R. Ex. 6 (September 1997 Koken Order); Cap. R. at 32–33. Thereafter, four petitions to intervene were filed. Commissioner Koken summarized petitioners' interests as follows (with emphasis added):

1. Subscribers to plan(s). (PSIM), Pennsylvania Medical Society (Medical Society), (Mon Valley).

2. Members of [Blue Shield]. (PSIM, Medical Society).

3. Physician provider for [Blue Shield] or a subsidiary. (PSIM, Medical Society).

4. Advocate or beneficiary of "social mission" of [Blue Shield]. (PSIM, Medical Society, Mon Valley).

5. Interest in governance of entity or entities. (PSIM, Medical Society, Mon Valley).

6. *Competitors. (Federation).*

7. Person serving the public, members of the public, and taxpayers. (PSIM, Medical Society, Mon Valley).

C.R. Ex. 73 (January 1999 Koken Order) at 32–33; Cap. R. at 307–08. In discerning whether the petitioners had standing to intervene, Commissioner Koken stated:

---

**28.** 17 Pa.C.S. §§ 101–1504.

**29.** Act of November 30, 1965, P.L. 847, *as amended,* 7 P.S. § 103 (one of purposes of the Banking Code is to provide an opportunity for institutions regulated by the Code to remain competitive with each other and with financial organizations existing under other laws of the Commonwealth).

the only alleged interests which are directly connected to the Commissioner's statutory authority *are interests as members and in governance of health plan organizations.* The only petitioners alleging these specific interests are PSIM and the Medical Society. PSIM and the Medical Society also assert each of the public interests except as competitors, and indirectly assert an interest in the transactions' effect on competition by asserting an interest in provider rates. *While an interest in competition may be insufficient in itself to confer standing, the interests as members and in governance are sufficient.* Accordingly, these petitioners are granted full party status. Although PSIM and the Medical Society have overlapping interests, the inclusion of each will not unduly burden these proceedings and will allow for full analysis where their respective interests diverge.

*The only petitioner directly asserting the interest of competitors is the Federation. Since the Federation has requested participation as amicus only*[30] *and competition is an issue of public importance, the Federation's limited participation is appropriate in light of 40 P.S. § 991.1402(f)(1)(ii) and 1 Pa.Code § 35.28(a)(2).*

*Id.* at 38–39; Cap. R. at 312–13 (emphasis and footnote added). Thus, a competitor of Highmark was permitted to participate in the administrative proceedings. Also, Commissioner Koken recognized the need for more than a bare allegation of harm to establish standing of a competitor.

## 2. Contentions

Capital's decision not to participate at the agency level deprives this Court of any

record supporting Capital's claim that the 1996 Approval Order in fact caused harm to its financial interest. *Citizens Against Gambling Subsidies*; Pa. Bankers Ass'n; *Nernberg.* Absent an independent statutory basis for standing, aggrieved status cannot be presumed for the first time on appeal to this Court, it must be established before the tribunal with original jurisdiction. *Id.* Capital failed to do so.

Capital, however, asserts it could not timely assert competitor standing to participate in the post-approval hearing because, at the time, a joint operating agreement barred Highmark from competing with Capital in its service area. Thus, Capital argues its direct interest in the administrative proceedings did not mature until Highmark unilaterally terminated the joint venture, which occurred approximately five years after the period for intervention closed.

Capital also contends it was harmed by Highmark's dual certificate because of the significant and unfair competitive advantages the status conveys. In particular, Capital asserts that Highmark is relieved of the costly regulatory and administrative burdens which Capital must bear for its competing non-blue (for-profit) professional service plan subsidiary. Also, Highmark's plans are shielded from Pennsylvania's 2% premium tax, while Capital's non-blue (for-profit) professional service plan subsidiary is subject to the tax. Capital does not cite to any part of the record; instead, it contends that Highmark's competitive advantage over Capital is beyond any serious argument.

**30.** "Amicus curiae (friend of the court) status in Pennsylvania is easily obtained. The rights of an amicus curiae, however, are very limited. The most important restriction on amicus curiae is the inability to appeal. In light of its nonparty status, an amicus curiae may not appeal an order adverse to its interests." 20 Darlington et al., Pa. Appellate Practice 2d § 501:6 (2007 ed.) (footnotes deleted).

Highmark contests both the fact of harm and the causation. It argues that Capital's decision to use a pre-existing for-profit subsidiary was not caused by the 1996 Approval Order and does not result in an unfair advantage.

### 3. Analysis: Proof of Harm

It is noteworthy that the arguments regarding Capital's competitive injury were never submitted to a Commissioner. Thus, there is neither decision nor record to review on this issue. This situation illustrates the wisdom of our Supreme Court's recent pronouncements that permitting an appeal absent intervention before the administrative agency is inconsistent with orderly rules of procedure and would foster impracticalities in terms of development of an essential record for consideration on appeal. *Society Hill Civic Ass'n; Citizens Against Gambling Subsidies.* Capital did not seek to participate and thus deprived itself of an opportunity to establish aggrieved status.

We reject the argument that any attempt by Capital to participate in the administrative proceedings would have been fruitless. This argument would be more persuasive if Capital had attempted to intervene and was prevented from doing so; however, Capital made no effort at all to intervene or even participate at some more modest status. In contrast, another competitor, the Federation, was permitted to participate despite Commissioner Koken's misgivings regarding standing.

In short, Capital did not demonstrate harm caused by the 1996 Approval Order. As a result, Capital's claim of competitor standing based on a direct interest in the Approval Order or 2006 Koken Order must fail. *Pa. Bankers Ass'n; Nernberg.*

### 4. Analysis: Statutory Basis for Standing

Although some statutes and regulations are designed to protect against competitive injuries, many are not. *Nernberg;* 20 Darlington et al., *Pa. Appellate Practice 2d* § 501:8 (2007 ed.).

### a. Blue Plans Act

Both Highmark and Capital operate nonprofit health plan corporations regulated by the Blue Plans Act. However, nothing in the Blue Plans Act expressly requires the Department or Commissioner to consider the interest of competitors in determining whether to approve an application for a certificate of authority for either a nonprofit hospital plan under 40 Pa.C.S. §§ 6102–04 or a nonprofit professional health service plan under 40 Pa.C.S. § 6304. In addition, nothing in the Blue Plans Act prohibits competition between nonprofit hospital plans.

Moreover, as discussed above, there are no provisions in the Blue Plans Act that expressly prohibit dual certification. Therefore, the Blue Plans Act does not provide an independent statutory basis for Capital to assert standing to challenge the 1996 Approval Order or 2006 Koken Order.

### b. Insurance Holding Companies Act

Further, as discussed above, the Insurance Holding Companies Act does not apply to the consolidation of Blue Shield and Western Blue Cross. Therefore, the market shares of those non-profit corporations were not utilized in the competition inquiries of that Act. Concomitantly, competition with those entities, without more, does not support standing here.

Also, nothing in the competition inquiries of the Insurance Holding Companies Act compels standing on appeal for each and every competing insurer regardless of participation or proof of harm. *See* Sections 1402(f)(1)(ii) (department shall

approve proposed acquisition of control unless it finds the acquisition would substantially lessen competition in insurance in Commonwealth or tend to create a monopoly) and 1403(d) (department may enter order denying application for acquisition if it finds proposed acquisition violates competitive standard), 40 P.S. §§ 991.1402(f)(1)(ii), 991.1403(d). In particular, the provisions do not mention standing at all. Thus, the provisions do not address standing for appeals, or even standing for participation at the agency level. In addition, no private right of action for competitive injury is created. Further, the provisions do not mention injury to an individual insurer as a method of gauging competitive effect. Instead, the provisions broadly relate to competition in any line of insurance in the Commonwealth and direct market share comparisons of "involved insurers." Section 1403(d), 40 P.S. § 991.1403(d).

Consistent with our holding in *Pa. Bankers Ass'n*, we conclude these provisions do not implicitly supplant the significant body of case law describing the requirements for establishing an aggrieved status.

In sum, neither the Blue Plans Act nor the Insurance Holding Companies Act provides a statutory basis for Capital to assert competitor standing for appeal in the absence of participation or record proof of harm.

### F. Conclusion

In conclusion, as directed by our decision in *Kaiser*, Commissioner Koken provided an opportunity for any interested persons, including Capital, to petition to intervene in a post-approval adjudicatory hearing and challenge the 1996 Approval Order. Capital chose not to participate in the adjudicatory hearing, which deprived Commissioner Koken of an opportunity to determine whether Capital had an interest sufficient to confer competitor standing.

Moreover, Capital's failure to petition to intervene in the post-approval hearing deprived Capital of an opportunity to establish on record that an administrative order caused competitive injury. Therefore, the record does not support Capital's claim here that it was "aggrieved" by either the 1996 Approval Order or the 2006 Koken Order. *Citizens Against Gambling Subsidies*; Pa. Bankers Ass'n. Absent an independent statutory basis for standing, an assertion of competitive harm for the first time on appeal to this Court is insufficient to confer standing to appeal an agency adjudication under 2 Pa.C.S. § 702. *Citizens Against Gambling Subsidies*.

Additionally, there are no applicable statutory provisions that provide Capital with an independent basis to assert competitor standing.

For these reasons, we hold Capital, by failing to intervene in the post-approval hearing and establish a direct interest, lacks the requisite standing to now appeal the 2006 Koken order under 2 Pa C.S § 702 on the ground that it was aggrieved by it. *Citizens Against Gambling Subsidies; Pa. Bankers Ass'n; Nernberg*.

In view of the foregoing, we quash Capital's petition for review.

### ORDER

AND NOW, this 14th day of November, 2007, for the reasons stated in the foregoing opinion:

The motion to quash the petition for review of Petitioner Robert B. Sklaroff, M.D., filed by Intervenor, Highmark, is **DENIED** and **DISMISSED;**

The 2006 Koken Order and the 1996 Approval Order are **AFFIRMED,** and the petition for review filed by Petitioner Rob-

ert B. Sklaroff, M.D., is **DENIED** and **DISMISSED** on the merits; and,

The motion to quash the petition for review of Petitioners Capital BlueCross and Capital Advantage Insurance Company, filed by Intervenor, Highmark, is **GRANTED,** and the petition for review is **QUASHED.**

Judge COHN JUBELIRER and Judge LEAVITT did not participate in the decision in this case.