## Wooden v. Highmark, Inc.

*David S. Senoff, Lauren C. Fantini* and *William R. Caroselli*, for plaintiffs.

*Samantha L. Southall, Jack M. Stover, Jayson R. Wolfgang* and *Craig D. Mills*, for defendant.

MCINERNEY, *J.*, August 8, 2013—Plaintiffs, Herman Wooden and Thomas Logan, are former corporate

members[1] of defendant, Highmark, Inc., a Pennsylvania non-profit, Blue Cross/Blue Shield corporation. In this action, plaintiffs ask the court to find that Highmark's accumulation of $1.2 billion in profits over the period 2005-2009 was improper in light of its nonprofit status. Plaintiffs' argument is logical and compelling. However, the judiciary is not the proper arm of government to restrain this particular charity's acquisitiveness. The legislature, which enacted the statutes governing nonprofits and insurance companies, and the executive branch, which regulates such entities under the statutes, are the ones who must say whether the accumulation of substantial profits by a nonprofit health insurer is improper.

According to its Articles of Incorporation, Highmark was incorporated to do the following:

> establish, maintain and operate one or more nonprofit hospital plans, professional health service plans, health maintenance organizations, preferred provider organizations or other health care or employee benefits services, plans or organizations and to provide subscribers and customers of such services, plans or organizations with hospitalization, medical, health care and other benefits and services.[2]

---

1. Plaintiffs ceased to be members of Highmark in May, 2009, when the members voted to limit membership to just directors of Highmark. Since the directors of Highmark previously approved Highmark's accumulation of profits, they are unlikely to bring any challenge similar to plaintiffs' in the future.

2. Articles of Incorporation of Highmark, Inc., Art. III, (3)(a), attached to plaintiffs' motion for partial summary judgment as exhibit B.

A Highmark PPO Insurance Plan is available to many employees of the Commonwealth of Pennsylvania, including the undersigned and other members of the judicial, legislative, and executive branches.

The articles also contemplate that Highmark will participate in the federal Medicare Program, which provides healthcare to older and disabled Americans.[3] The articles further state that "[t]he Corporation does not contemplate pecuniary gain or profit, incidental or otherwise, to its members or other individuals."[4]

Highmark operates both a nonprofit hospital plan, or Blue Cross Plan, and a nonprofit professional health service plan, or Blue Shield Plan.[5] In order to operate such Blue Plans, Highmark must satisfy the criteria of the national Blue Cross/Blue Shield organization, as well as local state insurance statutes. According to the parties, the national organization no longer requires that its licensees be nonprofit entities. However, the Commonwealth of Pennsylvania still does. Specifically, the state's Health Plan Corporations Act ("HPCA") provides:

> A corporation not-for-profit incorporated for the purpose of establishing, maintaining and operating a nonprofit hospital plan shall not commence business until it shall have received from the [Insurance] department a certificate of authority authorizing the corporation to establish, maintain and operate such a nonprofit hospital plan.[6]

---

*See* www.pebtf.org/Active/PlanMap (Website of the Pennsylvania Employees Benefit Trust Fund, which administers health care benefits to eligible Commonwealth of Pennsylvania employees, retirees and their dependents.)

3. Articles of Incorporation of Highmark, Inc., Art. III, (3)(d).

4. *Id.*, Art. IV.

5. These plans were originally operated by separate entities that merged, in 1996, to form Highmark. *See Capital BlueCross v. Pennsylvania Ins. Dep't*, 937 A.2d 552 (Pa. Commw. 2007)

6. 40 Pa. Cons. Stat. § 6102(a).

\* \* \*

> A corporation not-for-profit incorporated for the purpose of establishing, maintaining and operating a nonprofit professional health service plan, nonprofit dental service plan or nonprofit optometric service plan shall not commence business until it shall have received from the [Insurance] department a certificate of authority authorizing the corporation to establish, maintain and operate a nonprofit professional health service plan, a nonprofit dental service plan or a nonprofit optometric service plan, as the case may be.[7]

In other words, only a nonprofit corporation is eligible to receive the requisite certificate of authority to operate a Blue Plan in this state.[8] For-profit corporations are excluded because, in Pennsylvania, Blue Cross/Blue Shield entities are viewed as "charitable and benevolent institutions" and are afforded tax exempt status, as follows:

> Every hospital plan corporation holding a certificate of authority under this chapter is hereby declared to be a charitable and benevolent institution, and all its funds and investments shall be exempt from taxation by the Commonwealth and its political subdivisions.[9]

> Every professional health service corporation holding a certificate of authority under this chapter is hereby declared to be a charitable and benevolent institution,

---

7. 40 Pa. Cons. Stat. § 6304(a).

8. *See Capital BlueCross*, 937 A.2d at 572 ("Blue plans are required to be nonprofit corporations.")

9. 40 Pa. Cons. Stat. § 6103(b).

and all its income, funds, investments and property shall be exempt from all taxation by the Commonwealth or its political subdivisions.[10]

Furthermore, the Legislature has made clear in HCPA that it views nonprofit Blue Plan entities like Highmark as providers of necessary social services:

> It is hereby declared to be the purpose and intent of this chapter and the policy of the General Assembly to authorize qualified persons to provide adequate professional health services for residents of this Commonwealth who are unable to provide such services for themselves or their dependents at their own cost without depriving themselves or their dependents of such necessaries of life as food, clothing and shelter, and provide persons of over-income with the limited professional health services benefits set forth in this chapter.[11]

Nonprofit entities that offer Blue Plans, such as Highmark, are subject to regulation and supervision by the Pennsylvania Insurance Department, the Department of Health, and the Department of State.[12] Specifically, Highmark must submit annual financial reports to the Insurance Department, and it is subject to financial examination by the Insurance Department every three

---

10. *Id.* § 6307(b).

11. *Id.* § 6303(b).

12. *See* 40 Pa. Cons. Stat. §§ 6125, 6307(a), 6329, 6331, 6332. *See also Capital BlueCross*, 937 A.2d at 572 (Nonprofit Corporation Law, which governs Blue Plans, is "administered by the Department of State, not by the Department of Insurance.")

years.[13]

In addition to operating Blue and Medicare Plans directly, Highmark also owns several for-profit subsidiaries that are engaged in providing health related services. During the five years at issue here, 2005-2009, plaintiffs claim that Highmark and its subsidiaries planned for and generated more than $1.2 billion in net profits. During this same period, Highmark paid approximately $58 million to its top twelve executives, which amount included substantial profit-based bonuses.[14] Highmark retained the remainder of its profits and invested them in its for-profit subsidiaries and its traditional investment portfolio.[15] Plaintiffs object that a nonprofit should not be permitted to accumulate and distribute excess profits in these ways, but should instead use them for socially beneficial purposes.[16]

In making this argument, plaintiffs point to several provisions of the Nonprofit Corporation Law ("NCL"), which applies to Highmark because HCPA requires that

---

13. 40 Pa. Cons. Stat. §§ 6125, 6331.

14. In arriving at this rough figure, the court relied upon Highmark's executive compensation charts for 2004-2008 contained in the Insurance Department's 2009 *Report of Limited-Scope Examination of Independence Blue Cross Philadelphia, PA and Highmark Inc. Pittsburgh, PA Executive Compensation* (hereinafter "Insurance. Department's 2009 Report"), which is attached to Highmark's motion for summary judgment as exhibit 29.

15. Expert report of Stephen J. Scherf, CPA, p. 10 (February 24, 2013) (hereinafter "First Scherf Report"), which is attached to plaintiffs' response to Highmark's motion for summary judgment as exhibit 5. For the purposes of deciding the parties' cross-motions for summary judgment, the court has relied upon those facts that are undisputed and has accepted as true plaintiffs' version of disputed facts, including those set forth in its experts' reports.

16. It is not entirely clear from their pleadings and other papers what plaintiffs would like Highmark to do with its extra profits, but the court will assume plaintiffs' motives here are pure.

Highmark be a nonprofit corporation. Under the NCL, a nonprofit corporation or "corporation not-for-profit" is defined as "[a] corporation not incorporated for a purpose or purposes involving pecuniary profit, incidental or otherwise."[17] It does not appear from Highmark's Articles of Incorporation, that Highmark was formed for the purpose of generating profits. However, Highmark does appear to have deliberately evolved into a very profitable enterprise. It also appears that Highmark's executive officers planned, throughout the period at issue here, to make substantial profits, and they exceeded their own expectations for Highmark and shared in that purposeful profit-making when they received bonuses tied to those profits.

Plaintiffs claim that such intentional profit mongering exceeds the powers granted to nonprofit corporations under the NCL because the law allows them to make only "incidental" profits:

A nonprofit corporation whose lawful activities involve among other things the charging of fees or prices for its services or products, shall have the right to receive such income and, in so doing, may make an incidental profit. All such incidental profits shall be applied to the maintenance and operation of the lawful activities of the corporation, and in no case shall be divided or distributed in any manner whatsoever among the

---

17. 15 Pa. Cons. Stat. Ann. § 5103. By contrast, a "Corporation for profit" is "A corporation incorporated for a purpose or purposes involving pecuniary profit, incidental or otherwise, to its shareholders or members." *Id.*

members, directors, or officers of the corporation.[18]

The plaintiffs focus their argument on the Legislature's choice of the word "incidental," which the plaintiffs interpret as meaning "small" or at least "not substantial."[19] However, the important limiting language in the above provision of the statute is not the phrase "incidental profit," but rather the phrase "the charging of fees or prices for its services or products." While the NCL allows Highmark to charge fees for the socially beneficial health services its provides directly to members of the public, it is not permitted to make sizeable profits from such charitable endeavors. The above provision does not prohibit Highmark from earning substantial profits from activities other than the sale of its Blue Plan services.

Highmark charges fees for its primary Blue Plan services, and it may even make some profit from the sale of such services.[20] However, plaintiff did not produce evidence showing that the bulk of Highmark's profits came from the fees it charged Blue Plan participants. Instead, it appears that Highmark obtained its substantial profits from its investment in its for-profit subsidiaries and from its investment portfolio. Such investments are permitted by the Nonprofit Law:

18. *Id.* at § 5545.

19. "Incidental" has several meanings; it can be something "accidental," "unpredictable," or "minor, casual, or subordinate." American Heritage Dictionary, p. 912 (3d ed. 1992).

20. For the years 2005 — 2009, Highmark claims that it made a profit from the sale of its insurance products and services the first two years and sustained losses the last three years, for a combined total loss of over $93 million. *See* Highmark's Motion for Summary Judgment, ¶¶ 25-26.

Subject to the limitations and restrictions imposed by statute and, except as otherwise provided in paragraph (4), subject to the limitations and restrictions contained in its articles, every nonprofit corporation shall have [the] power:

&ast; &ast; &ast;

(4) To acquire, own and utilize any real or personal property ...regardless of any limitation set forth in its articles prior to January 1, 1972 ...as to the amount of income derived therefrom.

&ast; &ast; &ast;

(6) To ...acquire, own and dispose of ...capital stock and other securities.

&ast; &ast; &ast;

(8) To invest its funds ...[21]

In other words, Highmark is permitted to generate income by investing its funds in the market and in its subsidiaries, and the NCL does not expressly limit the profits it may make from such investments.

In fact, as a health insurer, Highmark is required to invest its funds and to maintain reserves and a surplus, so that it can pay claims and remain viable.[22] Under

___

21. 15 Pa. Cons. Stat. Ann. § 5502(a).

22. *See* Insurance Department's determination and order of February 9, 2005, at p. 10, which is attached to Highmark's motion for summary judgment as exhibit 23 (hereinafter "Insurance Department's 2005 Determination") ("At its most basic level, surplus represents a backstop of capital to ensure that unforeseen contingencies do not render a Blue

HPCA, the Commonwealth specifies the manner in which Highmark may invest its reserves and surplus:

> Any statute to the contrary notwithstanding, funds of any hospital plan corporation, equal to its reserves, shall be invested in compliance with the requirements of law for the investment of the capital and reserves of life insurance companies. The funds of any such corporation, equal to its surplus, shall be invested in compliance with the requirements of law for the investment of the surplus of life insurance companies.[23]

> Any statute to the contrary notwithstanding, funds of any professional health service corporation, equal to its reserves, shall be invested in compliance with the requirements of law for the investment of the capital and reserves of life insurance companies. The funds of any such corporation, equal to its surplus, shall be invested in compliance with the requirements of law for the investment of the surplus of life insurance companies.[24]

Furthermore, under HPCA, the Department of Insurance is charged with regulating the amount of such investments:

> A professional health service corporation shall at all times while engaged in business maintain reserves, in such form and amount as the [Insurance] department may determine, to insure its subscribers against loss

---

Plan unable to meet its obligations to its policyholders. Surplus also funds the growth needs of Blue Plans.")
23. 40 Pa. Cons. Stat. § 6123.
24. *Id.* § 6330.

through the failure of the corporation to provide the services agreed to in its contracts.[25]

In order to determine whether Highmark is financially healthy, the Insurance Department looks at Highmark's percentage of risk based capital ("RBC"). Apparently, under the Affordable Care Act, an RBC of only 250% is deemed sufficient, and the national Blue Cross/Blue Shield Association requires an RBC of only 375%.[26] However, the Insurance Department has expressly determined "that an appropriate sufficient operating surplus range …is 550% — 750% for …Highmark."[27] For the years 2005-2009, when Highmark was accumulating profits of $1.2 billion, Highmark's RBC was between 662% — 734%, well within the range set by the Insurance Department.[28]

The Insurance Department is charged with overseeing Highmark's financial health and necessarily has greater expertise in insurance matters than this court.[29] Since the department has found Highmark's RBC percentages "appropriate" and "sufficient", and not "inefficient,"[30]

---

25. *Id.* § 6321.

26. *See* First Scherf Report, p. 8.

27. Insurance Department's 2005 Determination, p. 37.

28. *See* First Scherf Report, p. 8. During the 2005-2009 period, the Insurance Department regularly found Highmark to be operating "sufficiently," which means it was well-capitalized, but not over-capitalized. *See* Insurance Department's Annual Statements of Surplus Levels for Blue Plans, which are attached to Highmark's Motion for Summary Judgment at Exhibit 24.

29. *See* Insurance Department's 2005 Determination and order, p. 9 ("In enacting HPCA, the General Assembly recognized that the Department is uniquely qualified to assess the reserve and surplus levels of the Blue Plans in Pennsylvania, a qualification upheld by our courts.")

30. *See id.* at p. 37 ("When a Blue Plan is above its sufficient surplus operating range, and thus outside the continuum of efficient levels of surplus, it has accumulated surplus at an economically inefficient level

the court must defer to the department's findings that Highmark has not accumulated excessive capital surplus as a result of its generation and investment of substantial profits during the 2005-2009 period.[31]

Plaintiffs also challenge Highmark's payment of substantial, profit based, bonuses to its top executives. The NCL specifically provides that "[a] nonprofit corporation shall not pay dividends or distribute any part of its income or profits to its members, directors, or officers."[32] However, in the next breath, the Legislature provided that "[a] nonprofit corporation may pay compensation in a reasonable amount to members, directors, or officers for services rendered."[33] The statute also gives nonprofit corporations the power:

(14) To pay pensions and establish pension plans, pension trusts, profit sharing plans, share bonus plans, share option plans, incentive and deferred compensation plans and other plans or trusts for any or all of its present or former representatives and, after their death,

that is likely inconsistent with the Blue Plans' status as statutory nonprofit, charitable and benevolent institutions.... In such instances, the Department will require the Blue Plan to justify its surplus level, or if its surplus level is excessive, provide a plan to the Department illustrating how it will reduce its surplus level back to within its sufficient surplus operating range over a reasonable period of time.")

31. *See Pennsylvania Human Relations Comm'n v. Norristown Area Sch. Dist.*, 473 Pa. 334, 349, 374 A.2d 671, 679 (1977) ("An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents.") Since the Insurance Department's 2005 Determination and order constitutes binding precedent, this court must follow it.

32. 15 Pa. Cons. Stat. Ann. § 5551 (a).

33. *Id.* at § 5551(b).

to grant allowances or pensions to their dependents or beneficiaries, whether or not the grant was made during their lifetime.

* * *

(16) To elect or appoint and remove officers, employees and agents of the corporation, define their duties, fix their reasonable compensation and the reasonable compensation of directors, to lend any of the foregoing money and credit and to pay bonuses or other additional compensation to any of the foregoing for past services.[34]

Plaintiffs have offered no evidence, expert or otherwise, to show that the salaries and benefits, including substantial profit-based bonuses, that were paid to Highmark executives were unreasonable. Instead, the evidence shows that the Insurance Department examined the bonuses and other compensation earned by Highmark executives for the years 2004-2008[35] and found them to be to be reasonable.[36]

Although plaintiffs and the public may look aghast at the high level of compensation paid to the executives of this supposedly "nonprofit" corporation, the court cannot find such payments to be unreasonable based upon outrage

---

34. 15 Pa. Cons. Stat. Ann. § 5502(a).

35. While the years at issue here are 2005-2009, there is no evidence that executive earnings during that period were substantially different than during the 2004-2008 period.

36. Insurance Department's 2009 Report, p. viii ("Because the annual compensation of the Highmark and IBC executives is similar to that paid to executives of other Blue Cross companies of similar size, that compensation is reasonable. The compensation of the Highmark and IBC CEOs is substantially less than the compensation of the CEOs of the leading for-profit health insurers.")

alone. The only evidence presented in this case indicates that Highmark's executive compensation, including substantial profit-based bonuses, is reasonable, at least among the rarified ranks of health insurance executives. Therefore, plaintiffs cannot proceed to trial on their claim that Highmark has improperly distributed its profits to its executives by paying them such bonuses.

## CONCLUSION

For all the foregoing reasons, the court must deny plaintiffs' motion for summary judgment and grant highmark's motion for summary judgment.

## ORDER

And now, this 8th day of August, 2013, upon consideration of the parties' cross-motions for summary judgment, the responses thereto, and all other matters of record, after hearing oral argument thereon, and in accord with the opinion issued simultaneously, it is ordered as follows:

1. Plaintiffs' motion for partial summary judgment is denied;

2. Defendant's motion for summary judgment is granted;

3. Judgment is entered for defendant and against plaintiffs on plaintiffs' claims; and

4. The parties' motions in limine are dismissed as moot.